A02A1964. IN THE INTEREST OF D. N. B., a child.
(574 SE2d 574)

PHIPPS, Judge.

L. B., the biological mother of D. N. B., appeals an order terminating her parental rights. In this appeal, she disputes two factual findings entered by the juvenile court. We find no error, however, and affirm.

When considering a challenge to the sufficiency of the evidence in a termination of parental rights case, we review the evidence in the light most favorable to the juvenile court's determination.[1] Further, when the evidence shows that a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost, we defer to the juvenile court's factfinding.[2]

When so reviewed, the evidence shows that L. B. had a lengthy history of neglecting her daughter and failing to satisfy the child's fundamental needs.[3] On July 21, 2000, D. N. B. was taken into emergency custody by the Paulding County Department of Family & Children Services (DFACS) at the request of a caretaker who did not know the whereabouts of L. B. At that time, D. N. B., then age four, had five abscessed teeth and numerous other decayed teeth and urgently needed dental work. Her gums were swollen, infected, and bleeding, and the child had difficulty eating. She had bruises and marks on her buttocks and thighs.[4] After stabilizing her medical condition with antibiotics, a pediatric dentist extracted the five abscessed teeth and performed other dental procedures including performing several crowns and several pulpotomies. Dr. Jim Shealy testified that the "terrible disrepair" inside the child's mouth likely had developed over "a relatively long period, at least six months to a year."

On August 15, 2000, the juvenile court placed D. N. B. into the temporary custody of the Bartow County DFACS. The custody order included a finding that D. N. B. was deprived as defined by OCGA § 15-11-2 (8) (A). The court found that the causes of the deprivation were: "[i]nstability of residence and possibly employment"; the mother's poor parenting skills, "most particularly by choice of caretakers"; medical neglect of the child; and "[p]hysical abuse of the child by casual, unrelated caretakers." On November 1, 2000, the juvenile court entered a supplemental order that listed eight mandatory requirements for L. B.'s reunification with D. N. B.:

1. [L. B.] shall obtain and maintain safe and stable housing.
2. [L. B.] shall become and remain financially stable.
3. [L. B.] shall insure that [the child's] medical needs are met.
4. [L. B.] shall protect [the child] from physical and sexual abuse.

---

[1] *In the Interest of D. B.*, 242 Ga. App. 763 (531 SE2d 172) (2000).

[2] *In the Interest of Z. B.*, 252 Ga. App. 335 (556 SE2d 234) (2001).

[3] While in the custody of others, D. N. B. was subjected to sexual and physical abuse.

[4] After DFACS obtained custody of the child, Dr. Patricia Gore, a licensed psychologist, began counseling her. D. N. B. needed treatment for reactive attachment disorder and post-traumatic stress disorder.

5. [L. B.] shall obtain a psychological evaluation and follow its recommendations.

6. [L. B.] shall maintain contact with [the child] by visiting her at least twice a month.

7. [L. B.] shall financially support [the child] while she is in foster care [make weekly payments of 20 percent of her gross income to DFACS].

8. [L. B.] shall cooperate with the Bartow County DFACS, maintaining at least weekly contact and informing the Department of any changes in her employment or living situation.

The juvenile court warned that "before reunification can be achieved," L. B. had to substantially comply with all eight elements of this plan.

After D. N. B. had been in state custody for more than a year, DFACS petitioned for termination of the mother's parental rights.[5] The juvenile court conducted a full evidentiary hearing that began on September 24 and concluded on October 23, 2001. Testimony indicated that L. B. had failed to comply with virtually every element of the reunification plan. Despite the requirement that she "obtain and maintain safe and stable housing," L. B. continued to drift from place to place. In fact, during the period at issue, L. B. lived in several different motels and did not obtain safe and stable housing for herself and D. N. B. On the day the hearing began, L. B. was living in the basement of a house belonging to her fiancé's parents, a location that a caseworker had evaluated and found unsuitable. When the hearing resumed about a month later, she had already been evicted for nonpayment of rent and had relocated to a two-bedroom, single bath trailer. Her fiancé and his two teenage sons were also living there. Given its size and the number of its occupants, a caseworker felt it would not provide appropriate housing for D. N. B.

Although L. B. belatedly did obtain the mandatory psychological evaluation, she failed to pursue any of the psychologist's recommendations. The licensed clinical psychologist, who tested and interviewed her, diagnosed L. B. as meeting the criteria for avoidant personality. According to the psychologist, L. B. blamed others for her problems, made excuses, and did not accept responsibility for her child or for her own life. He noted that she had difficulty forming stable relationships as reflected by the recurring pattern displayed in her four marriages in which she married abusive and irresponsible men. In his professional opinion, the mother's prognosis for change

---

[5] The father surrendered his parental rights to D. N. B. on June 19, 2001.

was "extremely poor," unless she successfully completed extended psychological counseling and obtained a good support system. However, it is undisputed that L. B. did not participate in any therapy or undertake parenting classes.

Other evidence showed that L. B. missed visits or showed up late for scheduled visits with D. N. B. and did not maintain the requisite contact by visiting D. N. B. at least twice a month. In addition, a caseworker testified that L. B. failed to maintain regular contact with DFACS and often could not be reached by telephone or mail.

Nor did she provide the requisite financial support for D. N. B. while she was in foster care. Although L. B. testified otherwise, records kept by DFACS indicated that she did not make the weekly child support payments as the plan required and had made only a single isolated payment of $225 during the entire time D. N. B. was in state custody. A caseworker testified that L. B. was approximately $2,500 in arrears in her child support obligation.

Based on the evidence, the juvenile court decided that L. B. had "substantial parenting deficits" and found "present, clear and convincing evidence that there is parental misconduct or inability in this case." In a highly detailed order, the court terminated her parental rights.

1. L. B. contends that the juvenile court erred in finding clear and convincing evidence that she had wilfully failed to complete her reunification plan with the Bartow County DFACS. She claims that she "substantially complied" with the plan. She points out that she remained employed, obtained the psychological evaluation, visited her child, and generally "made efforts to comply with the plan." She asserts that she tried to maintain stable housing and claims that she was unable to visit her daughter because DFACS had placed D. N. B. in another county with her biological father who spanked D. N. B. with a belt and left her unsupervised. L. B. reiterates the same willingness she espoused at the hearing to undergo counseling, to take parenting classes, and to submit to random drug screens. She urges this court to remand her case for the juvenile court "to establish a new reunification plan."

In termination of parental rights cases, we do not weigh the evidence or assess witness credibility; instead, we defer to the juvenile court's factfinding unless the evidence fails to satisfy the appellate standard of review.[6] Moreover, nothing in the statutory framework for terminating parental rights set forth at OCGA § 15-11-94 (a)-(b) requires that the parental misconduct or inability be wilful in nature.

Notwithstanding her protestations to the contrary, the record is

---

[6] *In the Interest of D. B.*, supra, 242 Ga. App. at 763.

replete with evidence that L. B. failed to fulfill the requirements of the reunification plan. Despite facing the prospect of the termination of her parental rights, L. B. implemented few substantive changes in her life. In fact, at the end of the hearing, the court observed, "[i]t seems to me unquestionable that the cause of the deprivation is likely to continue and will not likely be remedied. There have not been sufficient steps taken to indicate to me that there is going to be a change." The court noted that despite facing the imminent termination of her rights, she still lacked sufficient motivation to obtain psychological counseling. Noting that her child already had required treatment for reactive attachment disorder, the court observed, "there isn't any indication that your life is going to be any more stable. Your life just isn't different and your history is too difficult and you haven't demonstrated to me that it's going to be different." Because the record supports the juvenile court's factfinding that L. B. failed to comply with the elements of the reunification plan, we defer to that court's factfinding.[7]

2. L. B. contends that the juvenile court erred by making a factual finding that D. N. B. would continue to be a deprived child if returned to her. She argues that this finding is contrary to the facts which indicate that she "had a home, a job, a car, and a willingness to do whatever was required to regain custody of her daughter."

Evidence of past conduct may properly be considered in determining whether the deprivation would be likely to continue if the child were returned to the parent.[8] Here, the evidence clearly shows that D. N. B. was deprived while under her mother's care and that the deprivation was likely to continue and was likely to cause serious physical, mental, emotional, and moral harm to her.[9] In light of all the evidence, including L. B.'s consistent failure to provide a safe, secure, and stable home for D. N. B., we find that the juvenile court did not err in terminating the biological mother's parental rights.[10]

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 19, 2002.

*Mary F. McCord*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorneys General,*

---

[7] *In the Interest of Z. B.*, supra, 252 Ga. App. at 335.

[8] *In the Interest of J. O. L.*, 235 Ga. App. 856, 858 (510 SE2d 613) (1998).

[9] See *In the Interest of A. M. V.*, 222 Ga. App. 528, 531-532 (474 SE2d 723) (1996).

[10] See *In the Interest of M. J. T.*, 217 Ga. App. 356, 358 (457 SE2d 265) (1995).

*Neel & Smith, Barry S. Haney, Robert H. Wilson, Jr., Stephanie B. Hope*, for appellee.