A04A1425. IN THE INTEREST OF A. C. O. et al., children.
(605 SE2d 77)

SMITH, Chief Judge.

The biological father of five of eight children and the mother of all eight[1] appeal an order terminating their parental rights. In a single enumeration of error, they contend that the trial court erred in

---

[1] The appellant mother's children are A. C. O., F. R. O., W. L. R., H. L. O., W. L. O., R. L. O., K. L. O., and J. D. R. The appellant father's children are W. L. R., H. L. O., W. L. O., R. L. O., and J. D. R. The alleged biological fathers of the other children are not parties to this appeal; one is deceased, and two denied paternity or surrendered their parental rights.

terminating their parental rights, asserting that the evidence was not sufficient to support a finding of parental misconduct or inability by clear and convincing evidence. After review of the record, we find otherwise and affirm.

1. In considering a challenge to the sufficiency of the evidence in a termination of parental rights case, the evidence must be reviewed in the light most favorable to the court's determination. *In the Interest of D. B.*, 242 Ga. App. 763 (531 SE2d 172) (2000). When the evidence shows that any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights have been lost, we defer to the juvenile court's factfinding. Id.

So viewed, the evidence shows that appellants had a lengthy and extensive history of neglecting the children. In 1997, the Department of Family and Children Services (DFACS) took emergency custody of A. C. O., F. R. O., W. L. R., and H. L. O., ranging in age from five years to eight months, after they were found at home alone. After a hearing, the juvenile court found them to be deprived. In 1999, DFACS took emergency custody of sixteen-month-old W. L. O. and five-month-old R. L. O. after W. L. O. was found to have two fractures at different stages of healing, and the treating physician opined that this was "at least consistent with child neglect." At the time, the mother was homeless and the father was incarcerated. The juvenile court also found these children to be deprived. In 2000, DFACS obtained emergency custody of five-day-old K. L. O. because the appellant mother had no permanent residence, and the juvenile court entered a consent deprivation order. Finally, in 2001, DFACS obtained emergency custody of three-day-old J. D. R., and the juvenile court found the child to be deprived. As appellants acknowledge, neither these orders nor successive continuation orders finding the children to be deprived were appealed.

The original case plan proposed by DFACS for the first four children sought reunification of the family and set five goals: (1) maintain a relationship with the children; (2) be able to provide for the children's basic needs; (3) maintain stable employment; (4) complete parenting classes; and (5) cooperate with DFACS. Over the five-year period during which additional children were taken into DFACS custody, additional goals were added: (1) to visit the children; (2) to be drug and alcohol free; (3) to seek counseling for domestic violence; and (4) to pay child support. Concurrent reunification and nonreunification plans were developed in 2001, and in 2002 a plan proposing termination of parental rights was changed to reunification. After the children's court-appointed special advocate (CASA) recommended termination of parental rights, however, DFACS proposed a permanency plan of adoption for all eight children in May 2003. A petition for termination of parental rights was filed in March

2003, and a hearing was held in June 2003. In its order, the juvenile court found that the petitioner had shown clear and convincing evidence of parental misconduct, that the children are deprived, and "that such deprivation is likely to continue and will likely cause serious physical, mental or emotional harm to the children." The court found that it was in the best interests of the children for appellants' parental rights to be terminated. This appeal followed.

The termination of parental rights requires the juvenile court to undertake the two-step process outlined in OCGA § 15-11-94 (a), first considering the four findings outlined in OCGA § 15-11-94 (b) (4) (A). Because the parents did not appeal the juvenile court's finding of deprivation, they remain bound by that finding, leaving for determination only the remaining three criteria under that subsection. See *In the Interest of J. S. G.*, 242 Ga. App. 387, 388 (1) (529 SE2d 141) (2000). Those three criteria require proof that:

> (ii) The lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (iii) Such cause of deprivation is likely to continue or will not likely be remedied; and (iv) The continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

OCGA § 15-11-94 (b) (4) (A). The court then considers whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child. OCGA § 15-11-94 (a).

Here, the record contains evidence of all these factors. A DFACS caseworker testified that the parents had made progress in some of their case plan goals but had failed to comply with others, including failure to maintain a relationship with the children, failure to support the children, failure to complete parenting class, and failure to get counseling to deal with domestic violence and alcohol abuse. While the parents had visited the children more consistently during the year before the hearing, they had not maintained regular visits in the preceding years. The children were reluctant to go on supervised visits and hid or ran away from the parents; they were "nervous" and not "receptive" to contact; witnesses concluded that visitation was traumatic for the younger children and caused the older children anxiety. The father denied that the visits were traumatic for the children, contending that visits went well and the other witnesses were lying. While he acknowledged that the visits were "dramatic" for one child, K. L. O., he asserted that this was the fault of DFACS personnel and the foster parents, who "are spoiling him entirely too much."

A child support enforcement agent testified that the parents had signed consent agreements to pay child support but that both were substantially in arrears. While the father had made "several" payments personally, the majority of the monies received from him were through income withholding, tax refund intercepts, and unemployment benefits, and all the payments received from the mother were from tax refund intercepts.

The mother acknowledged that she had a history of domestic violence problems, including some with the appellant father, and arrests for public drunkenness and DUI. She had not regained her driver's license at the time of trial, contending she "didn't have time." She acknowledged that she failed to obtain substance abuse counseling. The father confirmed that he was on probation for the offense of statutory rape and that he was on the Georgia Sex Offender Registry. His driver's license had been suspended for a DUI conviction, but he continued to drink alcohol and drive an uninsured car without a license. He acknowledged that he did not obtain sexual offender or domestic violence counseling.

A psychologist who examined appellants testified that the mother's defensiveness and denial were so great that they interfered with the interpretation of testing. He did not find evidence of any major mental illness but concluded that she suffered from "passivity and dependency" that had persisted unchanged for at least six years. He testified that her condition made her incapable of resolving problems and that she could not protect her children from potential harm, particularly in view of the father's prior conviction for a sexual offense. He stated that although the mother should have sought out "some type of professional intervention," she had seen a counselor only once. The psychologist testified that persons with this sort of personality disorder are very resistant to change unless highly motivated to seek help.

The psychologist's examination of the father also showed defensiveness. He had a criminal history, including a conviction for statutory rape and several DUI arrests, and his psychological tests were consistent with an "excessive drinking pattern." His profile showed problems with impulse control and "irritability, hostility and aggressive outbursts, particularly when alcohol is an issue." However, the father did not acknowledge any alcohol or sexual related problems to the psychologist and did not feel he needed any counseling.

In view of the parents' "lack of insight into the emotional needs of the children and a long-standing maladaptive behavior pattern," as well as their "unpredictability and unstable psychological profiles," the psychologist concluded that his evaluation supported termination of parental rights and that "it would likely be detrimental for the children to be removed from their current environments."

In making its decision, the court was authorized to consider the parents' unwillingness to seek treatment in determining that the deprivation was likely to continue. *In the Interest of D. D. B.*, 263 Ga. App. 325, 328 (1) (c) (587 SE2d 822) (2003). While appellants insist that their recent history shows improvement and that the court "ignored the present and more recent past and focused on the distant past," recent improvements do "not require the court to conclude that a parent's long history of misconduct will now cease." *In the Interest of L. S. D.*, 243 Ga. App. 626, 628 (534 SE2d 109) (2000). Even in light of some evidence that the parents had taken recent steps toward reforming their lives, such improvements are not conclusive of parental fitness in light of "[a] long history of deficiencies in the supervision of [their] children, along with the other evidence detailed above." *In the Interest of A. G.*, 253 Ga. App. 88, 90 (1) (c) (558 SE2d 62) (2001). "The juvenile court was authorized to infer from the evidence of past conduct that the improvements in the [parents'] situation were not sufficient to justify maintaining the children in foster care limbo in hopes that [they] could achieve stability and provide an adequate home for [their] children." (Citation and punctuation omitted.) *In the Interest of M. L.*, 259 Ga. App. 534, 536 (1) (c) (578 SE2d 190) (2003).

The juvenile court was authorized to give more credence to appellants' seven-year history of instability, crime, drug and alcohol abuse, and failure to comply with their case plan goals than to their recent improvement in some, but not all, areas of difficulty. The record contains evidence that the children were deprived, the deprivation was attributable to a lack of proper parental care, the deprivation was likely to continue, and it was likely to cause serious mental, emotional, and moral harm to the children. See *In the Interest of A. M. V.*, 222 Ga. App. 528, 531-532 (474 SE2d 723) (1996). "The same evidence showing parental misconduct or inability may, and here does, establish this requirement." (Citation and punctuation omitted.) *In the Interest of J. B. A.*, 230 Ga. App. 181, 185 (2) (495 SE2d 636) (1998). A rational trier of fact could have found both clear and convincing evidence of parental misconduct or inability and that termination of parental rights was in the best interests of the children, and the juvenile court therefore did not err in terminating appellants' parental rights to the children.

2. While appellants did not enumerate it as a separate error, we also consider, and reject, their contention that the juvenile court improperly considered hearsay evidence. Appellants complain that the court based its findings of fact and conclusions of law on hearsay, particularly DFACS caseworkers' testimony with respect to appellants' domestic violence police reports and arrests and with respect to

one child's reaction to supervised visits. This contention is without merit for several reasons.

First, even if the juvenile court did consider hearsay, "the Georgia Supreme Court has held that a trial court's consideration of hearsay contained in such records will not constitute reversible error where the evidence introduced at the hearing, not considering the report, was sufficient to support the findings and conclusions of the juvenile court judge." (Citations and punctuation omitted.) *In the Interest of A. A.*, 252 Ga. App. 167, 168 (1) (555 SE2d 827) (2001). As noted above, the other evidence is sufficient to support the findings.

Second, "in all proceedings involving custody of a child, all information helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on the petition." OCGA § 15-11-56 (a). "To the degree any such information contained hearsay, the courts are presumed to have disregarded it. Here, the court expressly said it was disregarding hearsay. There is no reversible error where the evidence introduced (not including the hearsay) is sufficient to support the findings of the trial judge." (Citations and punctuation omitted.) *In the Interest of O. J.*, 257 Ga. App. 1, 4 (2) (570 SE2d 79) (2002). As the juvenile court noted during the hearing, "There is no jury here. I know what to read and what not to read." "The juvenile judge is presumed to know the law and to be capable of separating admissible grains of evidence from inadmissible chaff. Here, the judge explicitly stated that he would not consider any hearsay testimony." (Citation, punctuation and footnote omitted.) *In the Interest of K. N. C.*, 264 Ga. App. 475, 480 (3) (b) (590 SE2d 792) (2003).

Finally, "[e]vidence which is cumulative of other legally admissible evidence of the same fact, renders harmless admission of incompetent evidence." (Citation and punctuation omitted.) *Taylor v. State*, 263 Ga. App. 420, 423 (3) (587 SE2d 791) (2003). Here, other evidence in the record supports the conclusions of the juvenile court. The appellant mother herself testified to her history of domestic violence problems, including violent incidents with the appellant father. The police reports and criminal history reports from a number of those incidents form part of the record. DFACS caseworkers and a counselor testified at length regarding the children's adverse reactions to supervised visitation. The trial court did not err in its consideration of the evidence.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED SEPTEMBER 21, 2004.

*Vincent D. Sowerby*, for appellants.

*Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, James A. Chamberlin, Jr.*, for appellee.