A05A1296. IN THE INTEREST OF B. S., a child.

(618 SE2d 695)

JOHNSON, Presiding Judge.

This is an appeal from an order of the juvenile court terminating the mother's parental rights to B. S., a two-year-old child. The mother contends the trial court erred in concluding that the child was deprived due to lack of proper parental care, that any such deprivation would likely continue or not be remedied, and that such deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. We find no reversible error and affirm the juvenile court's order terminating the mother's parental rights.

The evidence presented at the parental rights termination hearing revealed the following: On April 14, 2003, the Bleckley County Department of Family and Children Services (the "Department") received a report that B. S., who was then three months old, was feeble, underweight and exhibited poor color. She had only gained two pounds since birth, had poor neck muscle control, a protruding abdomen, and was listless. An examination revealed that B. S. had dropped from the twenty-fifth to the third percentile on the growth chart since birth. B. S. was placed in foster care, and the Department developed a reunification case plan that required the mother to demonstrate the ability and the mental capacity to care for B. S. Under the case plan, the mother was to obtain and maintain a source of income and clean/safe housing and attend mental health treatment. Case plan reports show that the mother denied the child was malnourished, failed to properly feed the child during visitation, failed to obtain a stable home or employment, and failed to follow treatment recommendations following a psychological evaluation. B. S. was noted to be "somewhat developmentally delayed" and required therapeutic home services.

On January 5, 2004, the juvenile court issued an order finding B. S. deprived because of nutritional neglect. The mother did not appeal that order. Subsequent case plan reports demonstrate that the mother had not yet completed her case plan requirements. The mother was not prepared to care for B. S., who required constant medical attention, and, even though the mother regularly visited B. S., she often sat on the couch and only watched the child. On March 4, 2004, the juvenile court found that it was in the child's best interest to change the permanency plan to adoption. That order was not appealed. The Department filed a petition to terminate the mother's parental rights.

On April 22, 2004, the juvenile court held a hearing on the Department's petition to terminate the mother's parental rights. The case manager for the Department testified that B. S. was very small

for her age, and had always been puny and weak. Physicians diagnosed B. S. as a failure to thrive child. According to the caseworker, the child's mother was not concerned about B. S.'s weight or her health and refused to accept responsibility for the child's condition. After coming into the Department's custody, B. S. improved dramatically, putting on more weight within a month than she had gained the first three months of her life.

Another caseworker with the Department reported that the Department had provided the mother with a psychological evaluation, in-home and outside visits with a family therapist, a list of apartments and landlords, case plan decisions regarding the requirements and her progress, and a referral to mental health treatment. She testified that the mother failed to obtain and maintain both stable housing and stable employment for a six-month period. In fact, at the time of the hearing she was staying with her Pizza Hut manager, where she had worked for the last two months, and informed the caseworker that she would not be staying at that residence with B. S. In addition, the mother had not paid any child support for the child. And, while her visits were consistent, her interactions with the child were inconsistent. At times, she would sit and bite her fingernails, leaving the child to play alone on the floor. The caseworker further testified that the mother would not accept responsibility for B. S.'s malnourishment, and that the child now had several medical issues as a result of her malnutrition that might not be taken care of by the mother. The caseworker also expressed concerns about B. S. remaining in foster care and looking at the foster parents as her real parents.

The pediatrician who had seen the child since she was seven months old testified that her first examination revealed she had weak lower extremities. She could not sit up and was developmentally delayed. There was no question in the pediatrician's mind that B. S. had been malnourished before entering foster care and that this malnourishment resulted in her developmental delays. The pediatrician testified that at three months of age, B. S. should have doubled her birth weight. Since taking over the child's care, the child's progress was excellent, but she still had gross motor delays and could not walk at 15 months. In addition, B. S. has a medical condition that will require medication every day for at least one year. According to the pediatrician, failure to thrive children have a 50 to 60 percent chance of mental retardation, learning disabilities, and a multitude of other problems, including lack of growth potential.

A psychologist who evaluated the mother testified that intellectual testing revealed the mother functioned in the low/average range of cognitive skills. The mother appeared quite naive and immature, and the psychologist opined that her judgment and decision-making

might be problematic. The psychologist diagnosed the mother with "anxiety-disorder not otherwise specified" and suggested a "personality disorder with dependent and immature features." However, he stated that there was nothing that would prevent the mother from completing her case plan.

A family therapist who worked with the Department to help reunify the mother with B. S. testified that the mother initially displayed interest and attended meetings. However, after the first two months she became hard to find. The therapist testified that he explained the reunification case plan goals to the mother, and she understood the plan. Nevertheless, the mother moved from one friend's residence to another's and never established stable housing. In addition, prior to suspending services, he informed the mother that her situation was not stable enough to raise a child, especially in light of the fact that she had not completed some of the therapist's goals.

The child's foster mother testified that B. S. was "doing great." According to her, the mother was not very attentive during some of her visits and had not asked any questions about B. S.'s health.

The mother testified that she knew B. S. was not gaining as much weight as she should have been, but that she would have taken care of the problem if given the chance by the Department. She also disputed her lack of interaction at visitations, her lack of a stable home (she had lived at her current residence for about three months), and opined that her nurturing skills had "probably" improved.

The juvenile court found clear and convincing evidence of parental misconduct and inability. The court further found that the mother has unjustifiably failed to comply with previously ordered reunification case plans, and that termination of the mother's parental rights is in the best interest of the child. In addition, the court found no suitable family member with which to place the child.

The mother challenges the sufficiency of the evidence upon which the juvenile court terminated her parental rights. In considering a challenge to the sufficiency of the evidence in a termination of parental rights case, the evidence must be reviewed in the light most favorable to the court's determination.[1] When the evidence shows that any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights have been lost, we defer to the juvenile court's factfinding.[2] Viewed in this light, we find no merit to the mother's contention.

A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability,

---

[1] See *In the Interest of A. C. O.*, 269 Ga. App. 667, 668 (1) (605 SE2d 77) (2004).
[2] See *In the Interest of T. B.*, 267 Ga. App. 484, 484-485 (600 SE2d 432) (2004).

which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[3] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[4]

1. The mother contends the trial court erred in finding that B. S. was deprived due to a lack of proper parental care on the part of the mother. However, B. S. was adjudicated deprived due to a lack of proper parental care on the part of the mother by unappealed juvenile court orders, and the mother is bound by those findings.[5] Even without an express finding of deprivation by the juvenile court, there is clear and convincing evidence in the record that B. S. was deprived and still would be deprived if she were living with her mother.

Under Georgia law, a deprived child is one who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[6] Here, evidence shows that B. S. was malnourished, that the mother failed to accept responsibility for the malnourishment, that B. S. suffered developmental delays and other medical conditions as a result of the malnourishment, and that B. S. improved dramatically when removed from the mother's custody. Clearly, B. S. was deprived and a lack of proper parental care or control was the cause of her deprivation.

2. The mother asserts the trial court erred in concluding that any such deprivation would likely continue or not be remedied. We, again, disagree.

We first note that in addition to evidence of present parental misconduct or inability, evidence of past conduct may properly be considered in determining whether the deprivation would be likely to continue if B. S. was returned to her mother.[7] Repeated failure to comply with case plan goals may show that the cause of the deprivation is likely to continue.[8] Here, in considering whether the past deprivation was likely to continue, the juvenile court looked at the

---

[3] OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

[4] OCGA § 15-11-94 (a).

[5] See *In the Interest of D. L. S.*, 271 Ga. App. 311, 313 (1) (a) (609 SE2d 666) (2005); *In the Interest of E. C.*, 225 Ga. App. 12, 14-15 (482 SE2d 522) (1997).

[6] OCGA § 15-11-2 (8) (A).

[7] See *In the Interest of D. N. B.*, 258 Ga. App. 481, 485 (2) (574 SE2d 574) (2002).

[8] See *In the Interest of M. C. L.*, 251 Ga. App. 132, 135 (1) (a) (553 SE2d 647) (2001).

present progress, or lack thereof, of the mother's compliance with her case plan goals. It was obvious that, despite the best efforts of the Department to assist the mother in reuniting with B. S., the mother had made little progress and had failed to comply with her case plan goals. The mother had known for over a year that she needed to obtain and maintain, for a period of six months, suitable housing for herself and B. S. However, she had yet to establish a stable home. In fact, she had moved six times over the last year. And, while the mother testified that she "has plans" to get an apartment of her own, she admitted that she had not been able to get an apartment yet because she had not had any "decent help." The mother also had not obtained and maintained stable employment for a period of six months.

Despite recent efforts made by the mother to comply with some of her case plan goals, the juvenile court was entitled to place more weight on "negative past facts" than "positive promises" or projections as to the future, and to find that, in view of the mother's past conduct, the deprivation was likely to continue.[9] In considering recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation.[10] Here, the juvenile court heard the evidence at trial, which included the caseworker's testimony that the mother "waited until we got ready to come to court again to start working on her case plan." Based on this evidence, the juvenile court was authorized to find that the mother's parental unfitness is continuing and is unlikely to be remedied.

3. The mother contends the trial court erred in concluding that any such deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.

The same circumstances that supported the juvenile court's conclusion that B. S. is deprived due to a lack of proper parental care or control and that such deprivation is likely to continue also provide clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause B. S. serious physical, mental, emotional, or moral harm.[11] And, the juvenile court is not obligated to return a child to a parent and wait for the child to actually be harmed before terminating the parent's rights to the child.[12] Here, the facts clearly demonstrate that the mother failed to complete the Department's reunification plan and that she refused to

---

[9] In the Interest of R. A. R., 259 Ga. App. 680, 686 (2) (577 SE2d 872) (2003); In the Interest of V. I. D., 259 Ga. App. 40, 43 (576 SE2d 297) (2002).

[10] See In the Interest of A. M. L., 242 Ga. App. 121, 124 (1) (c) (527 SE2d 614) (2000).

[11] See In the Interest of M. J. T., 255 Ga. App. 553, 556 (565 SE2d 877) (2002); In the Interest of K. S. W., 233 Ga. App. 144, 149 (3) (503 SE2d 376) (1998).

[12] See In the Interest of V. M. T., 243 Ga. App. 732, 736 (3) (534 SE2d 452) (2000).

accept responsibility for B. S.'s malnourishment. The mother failed to obtain stable housing or employment, failed to improve parenting skills, failed to support B. S.,[13] and failed to interact significantly with B. S. during many of her visits. Moreover, B. S. now has several medical issues and developmental delays which will require ongoing care. The juvenile court was authorized to conclude that these needs would not be met by the mother.

In addition, the juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to B. S.[14] According to the caseworker, B. S. "can be emotionally harmed while remaining in foster care for a long period of time while we wait for mom, who has had ample time to complete a case plan, to complete one." It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems.[15] The juvenile court properly found that B. S.'s continued deprivation would likely cause her serious physical, mental, emotional or moral harm.

Here, the evidence showed that B. S. was removed from the mother's home when she was three months old; she is now two years old. B. S. has made tremendous nutritional and developmental gains since being in foster care, but she has medical issues and developmental delays attributable to the mother's deprivation. The evidence further shows no indication that the mother will be prepared in the near future to care for B. S. and to provide for her medical, emotional and educational needs. Considering all the needs of the child, including her special needs, the detrimental effects of prolonged foster care, and the evidence in the record, the juvenile court was authorized to conclude that B. S. would be better served by terminating the mother's parental rights.

*Judgment affirmed. Ruffin, C. J., and Barnes, J., concur.*

DECIDED JULY 27, 2005.

*Johnny R. Pannell*, for appellant.

---

[13] It is well established that the mother is required under Georgia law to provide for her child, financially and otherwise, with or without a court order expressly directing her to do so. OCGA §§ 19-7-2; 15-11-94 (b) (4) (C) (ii).

[14] See *In the Interest of R. A. R.*, supra at 686-687 (3).

[15] See id.; *In the Interest of M. C. L.*, supra at 136 (1) (b).

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Charles M. Johnson,* for appellee.