A05A1592. IN THE INTEREST OF J. H. et al., children.
(628 SE2d 140)

RUFFIN, Chief Judge.

The natural mother of J. O. H. and J. A. H. appeals the juvenile court's order terminating her parental rights. In her sole enumeration of error on appeal, the mother contends that there is insufficient evidence that the children's deprivation is likely to continue. Specifically, the mother contends that the Department of Family and Children Services (DFCS) "refus[ed] to use reasonable efforts to help [her] regain custody of her children." We disagree and therefore affirm.

In reviewing a juvenile court's ruling terminating parental rights, we view the evidence in a light most favorable to the juvenile court's determination.[1] We will affirm the lower court's ruling if the record demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[2]

Viewed in this manner, the record demonstrates that in early 2002, the mother was living in a Salvation Army homeless shelter with her two boys, four-year-old J. O. H. and two-year-old J. A. H.[3]

---

[1] See *In the Interest of B. S.*, 274 Ga. App. 647, 649 (618 SE2d 695) (2005).

[2] See id.

[3] We take this opportunity to remind counsel that, under this Court's rules, citations to the record "must be to the volume or part of the record or transcript and the page numbers that appear on the appellate records or transcript *as sent from the court below*." (Emphasis supplied.) Court of Appeals Rule 25 (a) (1). Here, there are multiple volumes, including several transcripts and more than one supplemental record. And although both parties have crafted disparate systems for citing to the record, the citations do not correlate with the record as transmitted by the lower court, which makes our job more difficult.

According to Anita Thomas, the manager of the shelter, the children: were not clean; were poorly supervised; were fed "junk food"; and had black eyes. Thomas also testified that the mother was supposed to be looking for permanent housing while at the shelter, which had a program whereby its inhabitants could bank money toward future rent. Although the mother received an income tax refund of approximately $1,200, she failed to bank any money toward future rent or to take advantage of the shelter's assistance in finding suitable housing.

During the time the mother was living in the shelter, she worked part-time at a local Wal-Mart. While at work, the mother kept her young children in a shopping cart for hours at a time. The mother's co-workers also testified that they saw the boys with black eyes. Susan Reems, one of the mother's co-workers, testified that Wal-Mart had a community involvement program, which helped employees meet personal needs. When the mother reported at work that she had "lost her place of residence," Reems helped her obtain temporary housing.

When DFCS received the report of the boys' black eyes and lack of supervision, the children were taken into custody, and DFCS filed a deprivation petition. Following a hearing on February 20, 2002, the mother stipulated that her children were deprived as she was unable to provide adequate housing and lacked parenting skills.

On March 4, 2002, the mother met with DFCS caseworker Dorothy Blocker. The mother indicated that she had mental health concerns, and DFCS scheduled a psychological evaluation for the mother with Dr. Harvey Gayer, which took place on March 6, 2002. The evaluation revealed that, from the age of seven, the mother was sexually abused by relatives. The mother's siblings also were sexually abused by their mother, who was imprisoned for her crimes. The mother stated that she had suicidal thoughts and fantasized about sexual relations with her own children. Following his evaluation, Dr. Gayer diagnosed her with Axis I pedophilia and recommended that the mother undergo treatment before reunification was attempted.

On March 13, 2002, DFCS developed a reunification plan that required the mother to, among other things: (1) "meet her mental health needs"; (2) complete family counseling; (3) maintain a positive relationship with her children; (4) find and maintain stable employment and housing; and (5) attend parenting classes. The mother was subsequently referred to Timothy Hinkle, a counselor at Family Counseling Services, to assess her risk of becoming a sexual offender. Hinkle met with the mother in April or May 2002. Hinkle concluded that the mother was a high risk, and he recommended that the mother undergo counseling, take parenting and anger management classes, and possibly take medication.

The case plan was signed on June 26, 2002, and the goals of the plan were incorporated into the juvenile court's order. To help the mother meet these goals, Blocker attempted to find appropriate parenting classes. As there were no suitable classes in the county in which the mother resided, Blocker referred her to parenting classes in a nearby county. The mother had transportation at the time, so Blocker thought the classes were appropriate. However, the mother said that the class conflicted with her work schedule, and she was apparently unwilling to attempt to change her schedule. Blocker also discussed the mother's housing situation, and the mother assured her caseworker that she was saving money and looking for suitable housing. During this time, the mother became engaged to a man, and Blocker was concerned that this new relationship would interfere with the mother's ability to focus on completing her case plan. DFCS subsequently learned that the man was physically abusive toward the mother.

In July 2002, Allison Ayres took over as the mother's DFCS caseworker. In early July, Ayres gave the mother a copy of her case plan and a copy of Hinkle's report along with Hinkle's phone number so that the mother could follow up with his treatment recommendations. According to Hinkle, he had a list of therapists who would provide treatment for indigent patients. Ayres also scheduled an appointment for the mother with Hinkle, but the mother failed to attend the appointment even though she was provided with bus passes for this purpose.

The mother apparently was fired from her Wal-Mart job, and Ayres tried to help the mother find employment elsewhere. Ayres suggested the mother seek employment at a nearby grocery store, but the mother responded that she "didn't like interacting with customers." Ayres also scheduled a visit between the mother and her children on July 15, 2002 at a DFCS office. The mother was 15 minutes late for the meeting, and she fell asleep on a sofa within minutes of arriving.

Ayres provided the mother with a visitation schedule for the remainder of July and for August, but the mother did not keep any of those appointments. On September 13, 2002, the mother informed Ayres that she was moving to Illinois. When asked how she would complete her case plan while in another state, the mother responded that she "had a better support system in Illinois and that was more important . . . for her at that time than visiting with her children." After the mother moved to Illinois, Ayres kept in phone contact with her. During an October phone conversation, the mother revealed that she had not been to a counselor and had no job. Ayres explained to the mother that, by remaining in Illinois, the mother "was not helping her case [plan] in any way." Ayres also told the mother that after 12 months, DFCS would start looking for a "permanent decision" for the

children and that they were planning to seek termination of the mother's parental rights.

Ayres also told the mother that an extension of custody hearing was scheduled for January 10, 2003, and the mother returned to Georgia for the hearing. After the hearing, Ayres arranged for the mother to visit her children at a local Chick-Fil-A. The mother told Ayres that she did not have the bus fare to attend the meeting, and Ayres gave the mother $3 out of her own pocket since the mother did not give Ayres enough notice to obtain a bus pass.

Despite getting the bus fare from Ayres, the mother was 15 minutes late to the visitation, explaining that she had used the money to buy cigarettes and had hitchhiked to the restaurant. According to the mother, she was going to resell the cigarettes to make some money, but Ayres noticed that the mother still had the cigarettes as well as a lighter. When the mother arrived, the boys were playing on the playground. J. A. H. hid from his mother in the slide. Both boys eventually hugged their mother, and J. O. H. spoke with his mother. According to Ayres, the mother showed no emotion and reacted to the boys "like she sees them every day." When it was time for her children to leave, the mother did not seem upset.

In addition to Ayres, court appointed special advocate (CASA) Sandra Francile also attempted to assist the mother. Francile was appointed to the case on August 5, 2002, and she scheduled a meeting with the mother on August 12 to discuss several job leads, including two that provided housing. However, the mother failed to show up for the appointment. Although Francile attempted to find the mother, she was unable to do so and eventually learned that the mother had moved to Illinois. Francile did not see the mother again until the January 10, 2003 hearing. Around that time, CASA provided the mother a list of resources in Illinois to help her comply with her case plan.

CASA also contacted an Illinois advocate to perform a home study of the mother's out-of-state residence. On March 25, 2003, Laura Tuffentsamer visited the home the mother shared with her grandfather. Although the mother had a month to prepare for the visit, Tuffentsamer said the house was "unkempt" and cluttered. Based on her observations, Tuffentsamer concluded that the home would not meet the minimum standards for placement under Illinois law.

A petition was filed seeking the termination of the mother's parental rights, and a hearing was conducted over the course of several days in April 2003. Multiple witnesses testified at the hearing, including both DFCS caseworkers; both CASA volunteers — including the witness from Illinois; Dr. Gayer; Timothy Hinkle; the

children's psychologist, Dr. Maria Gangarosa-Emerson; and the children's foster mother. Dr. Gangarosa-Emerson testified that J. A. H. had bonded with his foster family and that he needed a stable home to continue to thrive. Similarly, the doctor testified that J. O. H. was doing well in school, had bonded with his foster family, and had a good long-term prognosis if he were to remain in a stable home environment. The foster mother also testified that the boys, who had been with her family for 14 months, had bonded with the foster family and that she wanted to adopt them. Based upon the evidence presented and a consideration of its prior orders, the juvenile court terminated the mother's parental rights.

Before a juvenile court may terminate a parent's rights, it must first undertake a two-part inquiry.[4] First, the court must find parental misconduct or inability, which requires clear and convincing evidence that:

> (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[5]

If the juvenile court finds that these four factors exist, it must then "determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home."[6]

Here, the mother argues solely that there is no clear and convincing evidence that the deprivation is likely to continue. According to the mother, the record showed that she was "helpable," but DFCS did not engage in reasonable efforts to ensure she had proper assistance in dealing with her housing needs and mental health concerns. The crux of the mother's argument is that DFCS could have done more for her in which case she might have been able to comply with the case plan. We disagree.

"In determining whether the conditions of deprivation are likely to continue, the juvenile court may consider the past conduct of the parent."[7] Here, the record shows that the mother had ample assistance, not only from DFCS, but also from her co-workers at Wal-Mart, The Salvation Army, and the CASA appointed to her children's case.

---

[4] See *In the Interest of J. T. W.*, 270 Ga. App. 26, 32 (2) (606 SE2d 59) (2004).

[5] (Punctuation omitted.) Id. at 33.

[6] (Punctuation omitted.) Id.

[7] *In the Interest of L. G.*, 273 Ga. App. 468, 474 (2) (c) (615 SE2d 551) (2005).

Multiple people were willing to help the mother find housing, secure employment, and obtain treatment. However, the mother consistently failed to avail herself of any of the assistance and instead missed appointments, made excuses, and failed to return phone calls. The mother chose to leave the state although the move prevented her from seeing her children. And even before leaving Georgia, the mother missed numerous scheduled visits with her young children. Given her fundamental lack of effort to address her problems and complete her case plan, we will not allow the mother to shift the blame to DFCS.[8] It follows that the trial court did not err in finding the deprivation likely to continue, and we affirm the termination of the mother's parental rights.

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur.*

DECIDED MARCH 7, 2006.

*Lisa Lott*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Kathryn A. Pope*, for appellee.

---

[8] See *In the Interest of J. J.*, 259 Ga. App. 159, 165 (575 SE2d 921) (2003).