A05A1882. IN THE INTEREST OF B. L. et al., children.
(629 SE2d 89)

ADAMS, Judge.

The father of B. L., A. L. and J. L. appeals from the trial court's order terminating his parental rights. We affirm.

In his sole enumeration of error, the father contends that the record does not contain clear and convincing evidence to support the juvenile court's determination that the termination of his parental rights was warranted.

> The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the juvenile court's disposition, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.

(Citation and punctuation omitted.) *In the Interest of K. S. W.*, 233 Ga. App. 144, 147 (1) (503 SE2d 376) (1998).

So viewed, the record shows that the Paulding County Department of Family and Children Services (DFACS) first received a neglect referral with regard to B. L. and A. L. in July 2000.[1] The father was living with the children and their mother at the time, although the parents were not married and the father had not legitimated the children. When a DFACS caseworker visited the family's home on August 6, 2000, she noted that the residence was filthy and the family car was filled with maggots and old food. She also observed A. L., who was then 18 months old, putting pennies and batteries in her mouth.

DFACS developed a safety plan for the father and mother, which set a deadline for them to clean their kitchen, living room and bathroom and a separate deadline to clean their bedrooms. On August 17, DFACS determined that the couple were not in compliance with the plan and obtained emergency custody of the two children pursuant to a shelter care order.

The children were returned to the parents by order dated August 29, 2000, and DFACS was ordered to maintain protective services. DFACS then developed a second safety plan. At a judicial review hearing on October 2, 2000, the father agreed to move out of the family home and to seek anger management counseling due to several incidents between the parents. On October 12, the mother was arrested and the children were once again taken into protective custody. The children were returned to the mother on November 3, 2000, but DFACS continued to work with the family for the next ten months. During this period, on January 26, 2001, J. L. was born.

On September 17, 2001, the children's mother was again arrested, this time for theft of services, after she refused to pay a hotel bill. The father, who was living with his sister at the time, had not yet legitimated the children,[2] so DFACS obtained emergency custody. The children's mother consented to DFACS retaining custody of the children until the adjudicatory hearing on the department's deprivation petition. The juvenile court entered an order awarding DFACS temporary custody until the hearing.

DFACS developed a reunification plan for both the father and the mother on October 29, 2001. The case plan required the father to maintain a clean and safe home; maintain meaningful contact with the children, his case manager and DFACS; fulfill his support obligations; learn and demonstrate age-appropriate parenting skills by completing a six-week parenting skills class followed by ongoing parenting classes; manage his mental health needs by completing

---

[1] J. L. was born later, on January 26, 2001.
[2] The children were legitimated by consent order dated May 29, 2002.

anger management classes; become and remain drug- and alcohol-free; and resolve any pending legal or criminal issues.

On March 12, 2002, following an adjudicatory and dispositional hearing, the juvenile court entered an order finding the children to be deprived based upon factual stipulations by the parents. The order also awarded DFACS temporary legal custody of the children. That order was not appealed.

DFACS developed a second reunification plan for the parents on March 17, 2002. This case plan incorporated the same goals for the father as in the first plan, but also required that the father submit to a psychological evaluation.

On August 19, 2002, DFACS filed deprivation complaints and motions to extend its custody of the children, asserting that the parents had failed to comply with the case plans. The juvenile court entered a consent order extending DFACS's custody for one year, and neither parent appealed that order. DFACS subsequently changed the children's permanency plan to nonreunification and implemented nonreunification case plans on October 24, 2002 and June 6, 2003. The father filed a written objection to the nonreunification plan. On August 21, 2003, DFACS filed a motion for nonreunification and to halt visitation. By consent, the hearing on these motions was combined with a hearing on an extension of custody and termination of parental rights.

At the hearing on these matters, Jennifer Nice, a DFACS foster care manager, testified that the father had not complied with his case plan goals. Although he had completed parenting classes and submitted to a psychological examination, he failed to provide proof that he had completed the required anger management classes. In fact, DFACS received notice that the father had been dismissed from an anger management course for lack of attendance. Nice also testified that the father had failed to maintain a safe and stable home for the children and had failed to meet his child support obligations. Nice stated that the father had also failed to resolve his legal issues, noting that he had lost his driver's license for failure to pay child support.

Nice stated that she personally supervised 17 visits between the children and their father. These visits were scheduled for one hour every two weeks. The father missed four of these visits and was at least fifteen to thirty minutes late to three other visits. During a February 2004 visit, the father indicated that he was considering surrendering his parental rights. Nice concluded that the father had failed to maintain meaningful contact with his children as required by the case plan. She explained that, in her opinion, when a parent was allotted only one hour every two weeks with his children, meaningful contact would require that he attend the full hour of each scheduled visit.

Nice testified that B. L. initially experienced behavioral problems following visitation with his parents, including smearing feces on the bathroom walls at his foster home, acting out sexually, and acting aggressively. The child was currently receiving ongoing counseling and his aggressive behavior had improved. He also received speech therapy. B. L. had not been enrolled in school when DFACS obtained custody, so as a result, he started kindergarten one year late. At the time of the hearing, B. L. had resided in the same foster home for two years, and his foster parents wanted to adopt him. During this period, A. L. had resided with her maternal grandparents, who wanted to adopt her. J. L. had lived in the same foster care home since September 2001, and DFACS was exploring the possibility that he would be adopted by his foster parents.

Dr. Dennis Herendeen testified regarding the psychological evaluation he completed on the father on June 18, 2003. Dr. Herendeen gave the father a diagnosis of relational problems and found that there was some evidence to support a diagnosis of antisocial personality disorder, although he lacked sufficient supporting documentation to give the father an official diagnosis of this disorder. Dr. Herendeen's testimony detailed the father's performance on various tests. He stated that individuals with the father's testing pattern on the Minnesota Multiphasic Personality Inventory had low frustration tolerance, were aggressive and had difficulty learning from experience. The testing also showed that the father was impulsive, rebellious, and immature, which Dr. Herendeen noted were potentially dangerous traits for a parent. He also stated that the father would have difficulty transferring the values of society to his children, because it was something he had never learned himself. Further tests indicated that the father did not admit that he had any problems and did not believe that he needed help to address these issues. In addition, the father had an elevated score on a test that measured family problems, which suggested that he had a highly conflicted and possibly violent family history. The doctor noted that children raised by people with the father's score were at increased risk.

Based upon his diagnosis of relational problems and potential antisocial personality disorder, Dr. Herendeen believed that the father would require long-term therapy, but the likelihood of successful treatment was small. The doctor concluded that the children would be in danger if reunited with their father and also believed that the children's emotional and mental health would be harmed if they remained in foster care. Given these factors, Dr. Herendeen had recommended in his written evaluation that "any attempt at reunification should proceed cautiously, if it is considered at all."

The father testified that he lived with his father and mother in Alabama. He conceded that neither his current home nor his former residences were suitable for children. He also acknowledged that he had a lot of arguments and domestic violence issues with the children's mother. Although on September 12, 2002, the Paulding County Superior Court had ordered the father to pay $30 per child, per week in child support, the father admitted that he had only paid a total of $790 in support and had not made any payments after April 2003. That left him over $7,600 behind in his child support payments at the time of the hearing.

The father explained that he had been incarcerated twice since the children came into DFACS's custody and this affected his ability to pay child support. In October 2001, the father pled guilty to a 1999 battery charge involving the children's mother, and was sentenced to 12 months probation, 50 hours of community service, a $300 fine and anger management counseling. In February 2002, the father violated his probation by possessing medication prescribed for the children's mother. He was charged with seven felony counts of violating the Georgia Controlled Substances Act and was ordered to serve the remainder of his sentence in jail. As a result, the father was in jail from March to May 2002. Later, he was incarcerated for three days after he failed to appear in court. In 2003, the father did not file a tax return because he did not know how much income he had that year; in 2004, he earned only around $4,000.

The father admitted that he had missed all the scheduled visits with his children while he was incarcerated and, in addition, had missed four to five visits when he was not in jail. He stated that his driver's license had been revoked for failure to pay child support, which meant that he had no means of transportation. Nevertheless, he conceded that he had driven a car to the two hearing dates, despite having no license or insurance. The father admitted that he had disappointed himself and his children by not getting steady work and not establishing a home where he could bring them to live. Nevertheless, he wanted to have his children with him because he focused better when he had responsibility for them, and the day before he came to Atlanta for the hearing, he had started a new job and was trying to establish a home for the kids. He also testified that he had completed an anger management class in Alabama, but he did not introduce any written confirmation of his attendance into evidence.

At the conclusion of the evidence, both the children's guardian ad litem and their court appointed special advocate recommended terminating the father's parental rights. On September 2, 2004, the juvenile court entered separate orders terminating the parents' rights to their children.

A juvenile court applies the following two-step statutory analysis in determining whether to terminate parental rights:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. [Cits.]

*In the Interest of L. W.*, 276 Ga. App. 197, 200 (1) (622 SE2d 860) (2005). See OCGA § 15-11-94 (b) (4) (A).

1. With regard to the first step, the father does not contest the trial court's finding that the children are deprived or that the lack of proper parental care or control is the cause of the deprivation. He contends, however, that the record does not contain clear and convincing evidence to support the court's findings that the deprivation is likely to continue or that the deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. We disagree.

"Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Citation omitted.) *In the Interest of R. W.*, 248 Ga. App. 522, 524 (1) (546 SE2d 882) (2001). At the time of the hearing, the children had been under DFACS supervision for over two and one-half years. During that period the father was unable to maintain an adequate home for the children and had only provided $790 in support. He failed to keep all of his scheduled visits with his children due, in part, to his incarceration and the loss of his driver's license for failure to pay child support. Although the father completed the parenting course and stated that he had completed an anger management course, he failed to provide DFACS with written proof of his completion of the anger management class as required by the case plan. Moreover, although the case plan required him to resolve his legal issues, he was still without a driver's license due to his failure to pay child support, and yet he continued to drive. "Repeated failure to comply with case plan goals may show that the cause of the deprivation is likely to continue." *In the Interest of B. S.*, 274 Ga. App. 647, 650 (2) (618 SE2d 695) (2005). Moreover, despite the fact that the

father had started a new job the day before the hearing and hoped to one day make a proper home for his children, the trial court was not required to make the children wait for their father to fulfill these hopes. "In considering recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." Id. See also *In the Interest of S. G.*, 271 Ga. App. 776, 781 (611 SE2d 86) (2005) ("The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact."). We find that the evidence clearly and convincingly supported the trial court's determination that the deprivation was likely to continue. See *In the Interest of M. M.*, 276 Ga. App. 211, 215 (622 SE2d 892) (2005); *In the Interest of M. E. M.*, 272 Ga. App. 451, 454-455 (612 SE2d 612) (2005); *In the Interest of D. N. B.*, 258 Ga. App. 481, 485 (1) (574 SE2d 574) (2002).

And we find that clear and convincing evidence supported the juvenile court's determination that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children. In addition to the factors already discussed, the evidence showed that B. L., at least, had experienced difficulties after visitation with his parents, and Dr. Herendeen stated that the children would be at risk if returned to their father. "[T]he juvenile court is not obligated to return a child to a parent and wait for the child to actually be harmed before terminating the parent's rights to the child." *In the Interest of B. S.*, 274 Ga. App. at 651 (3). See also *In the Interest of M. E. M.*, 272 Ga. App. at 455.

2. The father also contends that the evidence does not support the juvenile court's finding that termination of his parental rights would be in the children's best interests. "A juvenile court has broad discretion in determining how the interests of the children are best served." *In the Interest of C. A.*, 278 Ga. App. 93 (628 SE2d 151) (2006). See also *In the Interest of M. L. P.*, 236 Ga. App. 504, 510 (1) (d) (512 SE2d 652) (1999). And "(u)nder Georgia law, the same factors that show the existence of parental misconduct or inability may also support a finding by the juvenile court that the termination of parental rights is in the children's best interests." *In the Interest of D. L.*, 268 Ga. App. 360, 364 (2) (601 SE2d 714) (2004). Thus, the trial court was entitled to consider the factors discussed above, as well as Dr. Herendeen's testimony that the children's emotional and mental health would be harmed if they remained in foster care. Each of the children is currently residing in a home with the potential for adoption. Accordingly, we find that clear and convincing evidence supported the trial court's finding that termination of the father's parental rights would be in the best interests of the children.

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED MARCH 23, 2006.

*Mark H. Yun,* for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Joseph T. Justice, Patricia K. Buonodono,* for appellee.