A04A2245. IN THE INTEREST OF H. Y. et al., children.
(606 SE2d 679)

ELDRIDGE, Judge.

The mother of H. Y. and A. Y. appeals from the March 8, 2004 order of the Juvenile Court of Polk County terminating her parental rights, contending that the evidence was insufficient to support the trial court's order and that the Department of Family and Children Services ("DFACS") failed to conduct a thorough search for a suitable family with whom to place the children. Finding no error, we affirm.

On appeal, we must view the evidence in a light most favorable to the juvenile court's order and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated. We do not weigh the evidence and must defer to the trial judge as the factfinder.

(Citations and punctuation omitted.) *In the Interest of K. A. C.*, 229 Ga. App. 254, 255 (3) (493 SE2d 645) (1997).

Viewed in this light, the evidence shows that DFACS became involved with the mother and the children in November 1999, when they had an ongoing child protective services case with her. When the referral came in, the mother and the children were living out of a car. However, by the time a DFACS caseworker received the complaint, the mother and children were living with the mother's sister-in-law. Because the sister-in-law had a current case of her own with DFACS, the caseworker felt it was best to separate the families. The mother rented a trailer in the same trailer park where her sister-in-law lived, and DFACS provided the mother with funds to pay rent and utilities for the first month, as well as furnishings necessary to provide a home for the children. The mother obtained employment at a Chevron station. The case was closed against the mother in March 2000, because the mother moved out of the county.

On October 27, 2000, DFACS received a second referral concerning the mother and the children. Upon investigation, DFACS learned that the mother and the children were living in a motel with the mother's boyfriend. Based on allegations of domestic abuse and substance abuse in the children's presence, the children were taken into custody. After the children came into DFACS custody, the mother admitted that her boyfriend was using crack cocaine and that there was domestic violence between the two of them. The mother further stated that she and her boyfriend moved into separate motels.

When the children came into custody, A. Y. had a severe large and circular burn on his hand. Upon inquiry, the mother stated that she had not sought medical treatment for A. Y. because she did not have transportation and that A. Y. had obtained the burn from a heater in the motel room. However, upon inspection by DFACS, there was no heater which would have caused such a burn. A. Y.'s top teeth were also severely rotted. In addition, there was evidence that the mother was feeding A. Y., who was 15 months old, peanut M&M's and other inappropriate food. During the first referral, DFACS had attempted to instruct the mother in properly caring for A. Y. nutritionally, as she was feeding him evaporated milk mixed with Karo syrup.

In regard to H. Y., his teeth were severely rotted and black. Light bruising was also observed on H. Y.'s back. When asked about the

bruises, H. Y. replied that the mother's boyfriend had "whipped" him. H. Y. also had a cut on the bottom of one of his feet. Further, the mother no longer was in possession of the furniture purchased for her by DFACS some nine months earlier, stating that she had lent it to a friend who refused to return it.

DFACS developed a reunification case plan for the mother under which she was required to maintain a parent-child bond with H. Y. and A. Y. by regular visitation; become and remain emotionally stable; obtain and maintain stable employment and housing; learn and demonstrate appropriate parenting skills; and become drug free. Her case plan goals were made an order of the juvenile court and were discussed with the mother on a monthly basis. The mother was consistent in visiting the children on a weekly basis, until May 2001, when the mother missed three visits in a row. The visits were changed to every other week because H. Y. became upset when his mother did not show up. Further, despite being informed by the caseworker that she needed to assume the role of a mother and disciplinarian during the visits, the mother consistently deferred to the DFACS caseworker and would ask her to make the children mind.

The mother attended some parenting classes, but never provided DFACS any documentation that she had completed the classes. The mother obtained an initial psychological evaluation. The mother was initially resistive to counseling recommended by the psychologist and informed the DFACS caseworker that she did not feel she needed counseling. However, the mother nevertheless later started counseling with Dr. Carson. The mother failed to maintain stable employment, changing jobs in excess of five times and having periods of unemployment during the two years DFACS worked with her. The mother also failed to maintain stable housing. During the two-year period DFACS was involved, the mother moved frequently, often staying in one place only a week or two. Her housing was often with the same relatives that DFACS initially found unacceptable or at a motel with the boyfriend with whom she was living when the children were taken into custody. During certain periods, the mother was unable to provide DFACS with an address and stated that she was living with friends.

Joy Crosby, a family services worker with DFACS, testified that the mother did not have her own transportation because she had trouble maintaining employment. Ms. Crosby attempted to contact the mother concerning medical appointments for H. Y. and A. Y.; however, it was difficult for her to do so because the mother did not provide her with a current telephone number or address. Ms. Crosby testified that there were at least 12 occasions when she did not know how to contact the mother.

The mother was referred by DFACS to Morning Star Family Resources Center ("Morning Star") for parent aid and in-home therapy. Rebecca Gurgiss, a family and homestead therapist employed with Morning Star, testified that she first met the mother in July 2001 and offered her services which included individual counseling, family sessions which involved parent education and training, and behavior modification techniques. Ms. Gurgiss testified that the mother missed several visits with her and a scheduled appointment with Alcoholics Anonymous. In October 2001, the mother moved and did not leave a forwarding address. Ms. Gurgiss tried to contact the mother but, after not hearing from her for a month, she closed the case. Ms. Gurgiss testified that at the time she closed the mother's case, the mother still had not established stable housing or employment, and that she needed to resolve stress and anxiety issues, strengthen her bonds with her children, and increase her parenting skills. Ms. Gurgiss further testified that at the time the mother's case was closed, she was more concerned about the mother's physical and emotional well-being than she was at the inception of the therapy sessions.

Concerning the mother's ability to offer a stable home and proper parenting to the children, Ms. Gurgiss opined that the mother needed to obtain a safe and stable home, be free from domestic violence, maintain stable employment, and continue to visit regularly with the children while they were in foster care in order to foster a bond with them. In addition, Ms. Gurgiss testified that the mother needed to resolve her relationship with the boyfriend with whom she was living when the children were taken into DFACS custody in that he continued to be abusive and have a substance abuse problem, to which the children did not need to be exposed.

Erin Salvatore, an in-home therapist with Morning Star, worked with the children between April and September 2003. Ms. Salvatore testified that H. Y. was having difficulty with aggression and acting out. Ms. Salvatore testified that A. Y. reported to her that H. Y. had touched him in a sexually inappropriate manner and that A. Y. was having difficulty dealing with the abuse. Ms. Salvatore stated that she did not think it was in the children's best interests to be placed together in the same home because of the risk H. Y. posed to A. Y. Ms. Jill Weaver, who has been a foster parent to the children on two different occasions, testified that A. Y. told her that H. Y. was touching him inappropriately and that she discussed H. Y.'s sexual abuse of A. Y. with the mother. At that time, the mother stated that she believed that H. Y. had been sexually abused by his uncle which might explain his sexually inappropriate behavior. Ms. Weaver further testified that A. Y. began to act out sexually later and had to be removed from her home.

Deposition testimony of Dr. Alice Wiener, a licensed psychologist, was admitted into evidence by stipulation. Dr. Wiener testified that upon observing H. Y., she found that he had a speech impediment and problems focusing on tasks, and that both his receptive and expressive language skills appeared compromised. Dr. Wiener further testified that H. Y. scored significantly below average as to intellectual ability, academic skills, and mental processing. She further reported that she could not rule out sexual abuse. Dr. Wiener opined that H. Y. should be under close supervision when around A. Y. or other younger children; that H. Y. should have a separate bedroom from A. Y.; that H. Y. should not bathe with A. Y.; and that H. Y. should not be in the room when A. Y.'s diaper was changed. In addition, Dr. Wiener recommended that H. Y. participate in play therapy to address neglect and boundary issues, his exposure to domestic violence and materials of a potentially sexually explicit nature, and the possibility that he may have been directly sexually abused.

Further, the deposition testimony of Dr. Richard Hark, a licensed psychologist, was admitted into evidence by stipulation of counsel. Dr. Hark testified that the mother relayed to him during their session that she was very worried, stressed, and anxious because of the loss of contact with her children. The mother reported that she had been involved with the juvenile court during her teenage years for truancy, harassing phone calls, and an act of family violence. The mother further admitted to the past abuse of alcohol, marijuana and cocaine. The mother reported that she had a stormy relationship with the children's father who she described as "a chronic alcoholic and very mean," and that she often left the father to stay with her boyfriend, who was also violent and abused marijuana. The mother also admitted that H. Y. had probably been present during some of the altercations of domestic abuse. Dr. Hark testified that H. Y. had been harmed by his exposure to the fierce altercations between the mother and her boyfriend.

Dr. Hark opined that the mother was angry about Dr. Wiener's recommendation that H. Y. and A. Y. sleep in separate rooms as opposed to together or with her. He also related that the mother admitted that she did not know how to discipline or control H. Y. and could not explain why she wanted custody of the children returned to her. The mother further reported to Dr. Hark that she did not take H. Y. or A. Y. for medical or dental care because her boyfriend had the car, and he did not believe in Medicaid or going to dentists. Dr. Hark opined that the mother lacked the strength and motivation that a mother should have because she constantly deferred to her boyfriend.

Dr. Hark testified that the psychological testing he conducted on the mother revealed that she was an extremely angry, passive/aggressive person. In addition, she had the potential to be

very irritable, sullen and argumentative; projected blame; refused to accept any responsibility for her problems or her behavior; resented the demands placed upon her; would place her needs before those of the children; was very dependent on men; and had illogical thoughts and impaired judgment. Dr. Hark further described the mother as high strung, very angry, very rebellious, and nonconforming. Dr. Hark opined that the mother was attracted to marginally acting-out people, such as the boyfriend she was living with when the children were taken into custody. Additionally, Dr. Hark testified that in his opinion it was unlikely that the mother would be able to change.

Dr. Hark testified that he observed the mother interact with the children and that "it was semi-controlled chaos." The mother did not know how to handle H. Y., who, in Dr. Hark's opinion, had severe attention deficit hyperactivity disorder and oppositional defiant disorder. Dr. Hark also testified that H. Y. was "beside himself with anger [and] with sibling rivalry." Dr. Hark further testified that the mother made bad judgments about disciplining the children and would not seek treatment she or the children needed no matter how may people recommended it.

Dr. Hark further testified that he felt it would be harmful for the children to be returned to the mother, because she would favor A. Y. Dr. Hark reported that if H. Y. were returned to the mother's custody, H. Y. would not receive proper treatment for his emotional and behavioral problems because the mother did not understand them and that she would continue to neglect the child. In addition, Dr. Hark predicted that if H. Y.'s problems remained untreated, he probably would be expelled from kindergarten, would not have friends, would be very angry and hostile, and would engage in hitting and attacking other children. Dr. Hark also opined that H. Y. might harm A. Y. because an intense sibling rivalry existed between the two children and that H. Y. would have serious psychological problems by age eight or nine.

Dr. Hark testified that there was nothing in his opinion about the mother that made her a good parent or that she had the motivation to change. Dr. Hark testified that the mother had no knowledge of parenting or discipline and did not understand the children's special needs. Dr. Hark further testified that the mother had not made any improvements and had failed to demonstrate that she had learned anything from her parenting classes. Dr. Hark opined that the children "would be put in harm's way" if they were returned to the mother.

At the termination hearing, the mother testified that after the children were removed from her custody, she lived in motels, with her mother, and her sister-in-law. At the time of the termination hearing

the mother was living with the sister-in-law whose home was determined by DFACS to be an inappropriate residence for the mother and the children at the time of the first referral and did not have stable housing of her own. Although she had held various jobs since the children were placed in DFACS' care, the mother testified that she was unemployed at the time. The mother further testified that she felt she did not need counseling, despite the recommendations of DFACS and Dr. Hark. Although the mother had not received any treatment for her problems between October 2001 and June 2002, she was taking Zoloft for anxiety and depression at the time of the termination hearing. *Held*:

The evidence presented amply supports the juvenile court's decision to terminate the mother's parental rights to H. Y. and A. Y.

The termination of parental rights under OCGA § 15-11-94 involves a two-step analysis.

> First, the juvenile court must determine whether there is [present] clear and convincing evidence of parental misconduct or inability, as defined in OCGA § 15-11-94 (b). Parental misconduct is found when the child is deprived, the cause of the deprivation is lack of proper parental care or control, the cause of the deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child.[1] Second, if the juvenile court finds clear and convincing evidence of parental misconduct or inability, it must consider whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[2]

*In the Interest of J. J. W.*, 247 Ga. App. 804 (545 SE2d 21) (2001).

1. (a) Because the mother "did not appeal the original order of the juvenile court finding that [H. Y. and A. Y.] were deprived, [she] cannot now complain about that finding." (Citations and punctuation omitted.) *In the Interest of N. J. W.*, 233 Ga. App. 130, 133 (1) (a) (503 SE2d 366) (1998).

(b) Further, the juvenile court had sufficient evidence to determine that the mother's inability to adequately care for H. Y. and A. Y. was the cause of their deprivation. In determining if the children lacked parental care or control, the juvenile court shall consider the

---

[1] OCGA § 15-11-94 (b) (4) (A).

[2] OCGA § 15-11-94 (a); *In the Interest of B. D.*, 236 Ga. App. 119 (511 SE2d 229) (1999).

various factors established by OCGA § 15-11-94 (b) (4) (B) (i) through (vi). In addition, the Juvenile Code requires that in those cases in which a child is not in the custody of the parent who is the subject of the termination proceedings, that the juvenile judge consider whether the factors of OCGA § 15-11-94 (b) (4) (C) (i) through (iii) are present.

In this case, the evidence set forth in the statement of facts above clearly established that the mother's actions and omissions regarding the children, both before and after they were placed in DFACS legal custody, constituted neglect within the meaning of OCGA § 15-11-94 (b) (4) (B) (v), in that the children were deprived due to the mother's physical, mental, or emotional neglect. The mother exposed the children to egregious living conditions and was unable to maintain a stable home for them, did not provide them proper nutrition and medical care, and subjected them to episodes of domestic violence and drug abuse by her boyfriend. Moreover, the mother failed to address the mental health needs of herself and the children.

Additionally, after the children were placed in DFACS custody, the mother failed to comply with the reunification case plan goals. See OCGA § 15-11-94 (b) (4) (C) (iii). She missed visits with the children. She did not obtain stable housing or stable employment. She continued to live periodically with the boyfriend who was abusive and used illegal drugs. She failed to complete the parenting class and did not learn to implement the skills she needed to effectively parent the children. Further, even though the mother completed an initial mental health evaluation, she failed to follow through with the recommended treatment. Additionally, the mother, having never obtained stable employment and financial stability, was unable to provide financial support of the children as required by law. See OCGA § 15-11-94 (b) (4) (C) (ii).

(c) The evidence also supports the finding by the juvenile court judge that the deprivation is likely to continue.

> Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue.

(Citation and punctuation omitted.) *In the Interest of V. S.*, 230 Ga. App. 26, 29 (1) (495 SE2d 142) (1997). The Court was entitled to infer from the evidence that the same pattern of deprivation would continue if the children were reunited with their mother, especially in light of Dr. Hark's testimony concerning the mother's emotional instability, her illogical thoughts, and impaired judgment; the mother's refusal to accept responsibility for her problems or behavior; the mother's placing her needs in front of those of the children; the

mother's anger over the recommendation that the children sleep separately, despite the fact that A. Y. had reported being sexually molested by H. Y.; the mother's inability to effectively discipline the children or to learn discipline techniques; the mother's deference to her boyfriend's decisions for the children's medical care, even when not in the best interests of the children; and the mother's refusal to seek proper treatment for H. Y. who was diagnosed with severe attention deficit hyperactivity disorder and oppositional defiant disorder. Most importantly, Dr. Hark testified that in his opinion the children "would be put in harm's way" if returned to the mother and that the mother did not have the motivation to change her behavior or improve her parenting skills.

2. Additionally, there was clear and convincing evidence that the termination of the mother's parental rights was in the best interests of the children. "The same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the [children's] best interest[s]. [Cit.]" *In the Interest of V. M. T.*, 243 Ga. App. 732, 736-737 (3) (534 SE2d 452) (2000). Additionally, "the juvenile court may further consider their need for stability and the harmful effects of extended foster care. [Cit.]" *In the Interest of C. N. S.*, 248 Ga. App. 84, 87 (545 SE2d 633) (2001). Herein, the children have been in foster care for nearly four years and deserve stability and permanency in their lives. At the time of the hearing, H. Y. and A. Y. were living in separate foster homes; however, they see each other daily at daycare and church. H. Y.'s foster parents have expressed a desire to adopt him, and are considering possibly adopting A. Y. later, which is the goal of DFACS if the mother's parental rights are terminated. Accordingly, we conclude the evidence presented amply authorized the juvenile court to terminate the mother's parental rights.

3. Lastly, the mother contends that DFACS failed to conduct a thorough search for a suitable family member to place the children with as required by OCGA § 15-11-103 (a) (1), which requires that the court attempt to place the children with a relative, when the rights of both parents have been terminated, if such placement would be in the best interests of the children.

At the time of the termination hearing, the children's guardian ad litem was not satisfied with the search for a suitable relative placement, and the juvenile court granted a continuance to allow for an evaluation of the maternal grandmother's home and the mother's sister's home. However, the sister's initial home evaluation was canceled because the mother and her sister moved from that residence.

DFACS made an initial visit to the sister's new home and told her what would be needed to complete a home evaluation on her. The

sister never contacted DFACS again. DFACS called the sister's home and left messages on her answering machine. When DFACS received no response to the messages, a letter was mailed to the sister asking her to contact DFACS. The letter was not returned to DFACS. The sister never contacted DFACS, and the home evaluation could not be completed.

DFACS also made an initial visit to the home of the maternal grandmother and told her what was necessary to complete a home evaluation on her. When DFACS did not hear from the grandmother for a month, DFACS attempted to contact the grandmother by telephone. Unable to contact her by telephone, DFACS mailed the grandmother a letter asking her to contact DFACS. The grandmother complied and told DFACS that she no longer desired to be considered as a placement for the children because her mother had just passed away, her live-in boyfriend had been injured in a car wreck, and she was currently providing daycare for another daughter's child. Based on the grandmother's statement, her home evaluation was never completed. The grandmother never contacted DFACS to say she had changed her mind and wished to be considered for placement.

At the time of the final hearing, the termination proceedings had been continued for over a year to allow for relative placement. While both the grandmother and the aunt testified at the final hearing that they would still like to be considered as placements for the children, the evidence was uncontroverted that neither of them had provided DFACS with fingerprints needed for a criminal background check or drug screens and that the grandmother had never provided DFACS with the requested information on her live-in boyfriend. The inability of DFACS to complete both of the home evaluations was not due to any failure on the part of DFACS, but was solely due to the failure of the maternal grandmother and the mother's sister to comply with DFACS' requirements and provide the requested information. Under these circumstances, we find no abuse of discretion in the trial court's determination that DFACS had complied with OCGA § 15-11-103 (a) (1) and that it was in the children's best interests not to be placed with either the maternal grandmother or the mother's sister.

*Judgment affirmed. Ruffin, P. J., and Adams, J., concur.*

DECIDED NOVEMBER 18, 2004.

*Ralph F. Forsythe*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Mundy & Gammage, Billie J. Crane*, for appellee.