623 S.E.2d 547 (2005)
276 Ga. App. 437
In the Interest of B.J.F., a Child.
No. A05A0884.
Court of Appeals of Georgia.
November 18, 2005.
*548 Roderick Martin, David Koontz, Marietta, for Appellant.
*549 Thurbert Baker, Attorney General, Shalen Nelson, Senior Assistant Attorney General, Charissa Ruel, Assistant Attorney General, Sanders Deen, for Appellee.
BARNES, Judge.
The mother of B.J.F. appeals the order of the juvenile court terminating her parental rights. She maintains that the evidence was insufficient to support the termination. Upon review, we find the evidence sufficient and affirm.
In reviewing the mother's challenge to the sufficiency of the evidence, we determine whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found by clear and convincing evidence that the natural mother's rights to custody have been lost. In the Interest of A.C., 230 Ga.App. 395, 396(1), 496 S.E.2d 752 (1998). We do not weigh the evidence or determine witness credibility but defer to the juvenile court's factfinding. In the Interest of L.H., 236 Ga.App. 132, 133(1), 511 S.E.2d 253 (1999).
Viewed in this light, the evidence shows that the Department of Family and Children Services first became involved with B.J.F. in October 1999 when he was two weeks old. While his parents were walking along the street with the infant in a stroller, the stroller was hit by a car. The baby was ejected from the stroller and suffered a fractured skull. Although the baby was only two weeks old, the parents waited 24 hours before seeking medical treatment. Following a detention hearing, the juvenile court found that there was evidence of deprivation pending a formal hearing, and granted temporary legal custody to DFACS. The court found probable cause that the parents were "mentally challenged to the degree that the children's safety and medical needs are placed at risk," and "[t]he parents need to be assessed as to their capability to parent the children." The psychologist who evaluated the mother found that she has borderline intellectual functioning, evinced by her IQ of between 70 and 79. He thought that this deficit could compromise the mother's ability to fulfill B.J.F.'s basic needs. Following a hearing, B.J.F. was adjudicated deprived because of the parents' low intellectual functioning which placed the child at risk.
The deprivation order was not appealed. The reunification plan required the mother to maintain contact with B.J.F., fulfill support obligations, complete parenting skills classes, and undergo individual counseling. A revised plan required the mother to also maintain stable housing, suitable employment, and to demonstrate nurturing parenting skills that would indicate an ability to ensure the child's health and safety.
In June 2000, a judicial citizen review panel recommended termination of the mother's parental rights, but the juvenile court continued custody in the Department. A case plan report showed that the mother had completed parenting classes, and was currently employed. A September 2000 citizen review panel noted that the mother was making "limited progress," and recommended concurrent nonreunification and reunification plans.
In January 2001, DFACS filed a petition to terminate the mother's parental rights, alleging, among other things, that the mother had effectively abandoned her child in foster care, had a medically verifiable physical, mental or emotional deficiency, and failed to comply with her case plan. Following a November 2001 hearing, the juvenile court denied the petition, noting that the guardian ad litem had recommended that the petition be denied, and finding that the mother had not wilfully failed to comply with a court order in the past 12 months, and had not abandoned B.J.F.
After its next review, the citizen panel recommended adoption by the foster parents. It noted that "all the panel believe that adoption by the current foster family is [B.J.F.'s] only hope for a safe, permanent home." The child was over two years old at the time and had been in temporary custody of the Department since he was two weeks old. The panel described B.J.F.'s behavior as "changed to a type of insecurity, unsure and depression following visits with mother at this time. Having trouble sleeping. Foster parents says he is very frightened about `visits-meetings'etc. with mom." It was *550 noted on the report that the mother had another infant removed from her care in another county. The mother was present at the review, but did not sign the report.
In April 2002, DFACS filed another deprivation petition, which the trial court granted, and which was also not appealed. The court noted that "the mother is in agreement with the child remaining in the temporary custody of the department," and also that the father had voluntarily terminated his parental rights. The juvenile court noted that it had adopted a permanency plan of "gradual but deliberate reunification" in December 2001.
In June 2002, the citizen review panel again recommended termination of the mother's parental rights. The panel noted that the mother was unemployed, and it was concerned about the child's frequent "staring spells." A doctor who had performed a neurological evaluation on B.J.F. diagnosed the child with an anxiety disorder characterized by "staring spells" which he uses as coping mechanisms in response to traumatic situations. He surmised that the child's "frequent visits with the biological mother is [sic] detrimental to [B.J.F.'s] psychological well-being. We believe the frequency of the visits should be decreased."
In September 2002, the court issued an order on the Department's motion to establish a nonreunification case plan, denying the motion, finding that reunification was appropriate, and increasing the mother's visitation to unsupervised with B.J.F. for two days a week. In August 2003, the child was again adjudicated deprived because of the mother's inability to master parenting skills and her mental disability. The juvenile court noted that although "[n]umerous services have been contracted by the department to assist with reunification between the mother and child ... any rehabilitative information provided to the mother has not resulted in the mother mastering parental skills nor being able to demonstrate the ability to use any learned behaviors." DFACS subsequently filed another motion to terminate the mother's parental rights, which was granted in April 2004. That order is the basis for this appeal.
1. A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A)(i)-(iv). If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. OCGA § 15-11-94(a).
(a) The first factor in the determination of parental misconduct or inability is consideration of whether the child is deprived. In this case, B.J.F. was adjudicated deprived by unappealed juvenile court orders, and the mother is bound by those findings. In the Interest of R.G., 249 Ga.App. 91, 93(1)(a), 547 S.E.2d 729 (2001).
(b) The next factor is whether lack of proper parental care or control is the cause of the deprivation. In making the second finding, whether the lack of proper parental care or control is the cause of the child's deprivation, the court may consider certain factors which "render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." OCGA § 15-11-94(b)(4)(B)(i). Among these factors are "[a] medically verifiable deficiency of the parent's physical, mental, or emotional health." Id. The juvenile court may also consider whether the mother "failed significantly for a period of one year or longer" before the filing of the petition for termination of parental rights to (1) develop and maintain a parental bond with the child in a meaningful, supportive manner, or (2) to comply with a court-ordered reunification plan. OCGA § 15-11-94(b)(4)(C).
Here, the plan required the mother to, among other things, maintain steady employment and stable housing, complete a parenting class and improve her parenting skills, pay child support, obtain a psychological *551 evaluation, and follow through with recommended treatment. The juvenile court found that although the mother visited the child regularly, other plan goals were not met. Although the mother made some progress in her plan goals, evidence supports the juvenile court's conclusion that the mother failed to comply with her court-ordered reunification case plan. At the time of the termination hearing, she was unemployed and had been so for two years. The mother also failed to provide any financial support for B.J.F. for the over three years that he was in the custody of DFACS.
At the termination hearing, the psychologist who evaluated the mother and B.J.F., and who performed a custody advice assessment testified that independent living may be a challenge for the mother and might present dangers for B.J.F. because of his mother's inattention and forgetfulness. He had first evaluated the mother approximately one year before the termination hearing, and had worked with the mother and B.J.F. jointly to improve the mother's interaction with her son, and provide help and suggestions with other child-rearing skills. He testified that during their sessions the mother tended to want to engage B.J.F. in conversation, and he would direct the mother's attention to the child in an attempt to get her to engage the child. He further testified that he had seen no improvement in the mother's child-rearing skills since the first time he evaluated her. He also testified that B.J.F. had become "more directly negative about engaging his mother over the course of time." In his custody assessment report he concluded that "of greatest significance in the current findings is the intellectual, emotional, academic, and judgment limitations of the biological mother. It is the examiner's opinion that she would continue to expose [B.J.F.] to significant risk both physically and psychologically if he were to be returned to her sole custody." At the termination hearing, he testified that his conclusions had not changed during the time he head been working with the mother.
B.J.F.'s caseworker testified that "it's kind of questionable what sort of bond we've got [between the mother and child]," because the mother "doesn't engage a whole lot." While B.J.F. appeared to come to the visits willingly, there were occasions when he did not want to visit and wanted the visits to end early. The guardian ad litem testified that the mother was unable to maintain a sanitary home for any extended period of time. The house was in a state of disarray whenever he made unannounced inspections. He further testified that he had once delayed B.J.F.'s overnight visitation with his mother to allow her to get her apartment clean and reinspected. He opined that, despite being provided with every opportunity, "for some reason [the mother] has an inability to develop a bond with this child. There is absolutely no parental child bond there." He recommended that the parental rights of the mother be terminated.
"A mental disability that renders a parent incapable of caring for the child is a valid legal basis for termination." (Citations and punctuation omitted.) In the Interest of L.H., supra, 236 Ga.App. at 135(1), 511 S.E.2d 253. Moreover, the mother's failure to comply with her reunification case plan goals may be a factor in concluding that her inability to care for her son was the cause of his deprivation. See In the Interest of H.Y., 270 Ga.App. 497, 504(1)(b), 606 S.E.2d 679 (2004).
Based on the foregoing, we conclude that any rational trier of fact could find by clear and convincing evidence that the mother's lack of parental care and control was the cause of B.J.F.'s deprivation. "While the mother's efforts to improve herself are good, the trial court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court." (Citation and punctuation omitted.) In the Interest of Z.B., 252 Ga.App. 335, 338(1), 556 S.E.2d 234 (2001).
(c) Next is a finding of clear and convincing evidence that the cause of the children's deprivation was likely to continue or would not likely be remedied. OCGA § 15-11-94(b)(4)(A)(iii). The mother contends on appeal that she completed the goals of her previous case plans and that she is prepared to provide a suitable home for her child. She argues that the home inspection *552 was done many months ago and does not represent its current condition; her low IQ does not reflect her ability to raise her son; and she was not allowed to bond with B.J.F. because he has been out of her custody since he was 17 days old. However, "judging the credibility of her good intentions was a task for the juvenile court." In the Interest of N.M.H., 252 Ga.App. 353, 356, 556 S.E.2d 454 (2001). Moreover,
[t]he court is entitled to infer from the evidence that, despite the best efforts of DFACS and many other social workers and charities, the same pattern of deprivation would continue each time the [child was] reunited with [his] mother. Moreover, the juvenile court is not required to reunite a child with a parent in order to obtain current evidence of deprivation or neglect.
(Citations and punctuation omitted.) In the Interest of C.M., 251 Ga.App. 374, 376, 554 S.E.2d 510 (2001). Significantly, in determining whether conditions of deprivation are likely to continue, the juvenile court was authorized to consider the over three-year history of deprivation suffered by B.J.F. See In the Interest of R.W., 254 Ga.App. 34, 36(2)(a)(iii), 561 S.E.2d 166 (2002). The record is replete with evidence of the mother's continued problems with parenting skills, unemployment, and lack of parental bonding with her son.
Even in light of some evidence that the mother had taken some steps toward reforming her life, such improvements are not conclusive of parental fitness in light of her prior history. See In the Interest of A.G., 253 Ga.App. 88, 90-91(1)(c), 558 S.E.2d 62 (2001). "[T]he juvenile court was authorized to infer from the evidence of past conduct that the improvements in the mother's situation were not sufficient to justify maintaining the [child] in foster care limbo in hopes that the mother could achieve the [needed parenting skills] and provide an adequate home for [B.J.F.]" (Footnote omitted.) Id. at 91(1)(c), 558 S.E.2d 62. "The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact." Id. Thus, the evidence presented supports the juvenile court's finding that it is very likely that the deprivation of the child will continue.
(d) The juvenile court was also authorized to find from the same evidence detailed above that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the child. See In the Interest of A.M.L., 242 Ga.App. 121, 124(1)(d), 527 S.E.2d 614 (2000). Expert testimony established that the mother's mental deficiencies, which contributed to her inability to properly parent her children, were likely to lead to additional problems if B.J.F. was returned. Moreover, the mother failed to obtain employment, support her child, or improve her parenting skills specific to bonding with B.J.F. There is no indication that the mother will be any more prepared in the near future to provide proper care for B.J.F. Additionally, the juvenile court was authorized to consider B.J.F.'s need for permanence and emotional stability and the adverse effects of more than three years in foster care in making this determination. See In the Interest of R.A.R., 259 Ga.App. 680, 686-687(3), 577 S.E.2d 872 (2003).
[O]bservations by [DFACS] workers of the interaction between [B.J.F.] and [his] mother indicate that the child has not bonded with the mother. In fact, [B.J.F.] calls [his] foster mother "mom." Such evidence supports a finding that [the child] would suffer confusion, developmental stagnation, and other serious harm if returned to the mother's custody.
In the Interest of A.K., 272 Ga.App. 429, 438(1)(d), 612 S.E.2d 581 (2005).
2. Finally, the evidence was also sufficient to support the juvenile court's determination pursuant to OCGA § 15-11-94(a) that, there being clear and convincing evidence of parental misconduct or inability, termination of appellant's parental rights was in the best interest of the child, considering the child's physical, mental, emotional, and moral needs, and the child's need for a secure and stable home. The same factors which showed the existence of parental misconduct or inability also supported the finding that termination of appellant's parental rights was in the child's best interest. In the Interest of B.L.H., 259 Ga.App. 482, 485(1), *553 578 S.E.2d 143 (2003). In making this finding, the court properly considered that the foster home where the child has been living since being placed in DFACS custody has expressed an interest in adopting the child. In the Interest of P.A.T.L., 264 Ga.App. 901, 904(2), 592 S.E.2d 536 (2003).
Judgment affirmed.
RUFFIN, C.J., and JOHNSON, P.J., concur.