628 S.E.2d 713 (2006)
278 Ga. App. 297
In the Interest of C.T.M. et al., children.
No. A05A2039.
Court of Appeals of Georgia.
March 17, 2006.
*714 William A. Adams, Jr., Thomaston, Monica N. Hamlett, for appellant.
John R. Mallory, Alonzo J. Bentley, Jr., Mallory & Trice, Thomaston, Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, for appellee.
RUFFIN, Chief Judge.
The juvenile court terminated the natural mother's parental rights to her two children, C.T.M. and T.A.M.[1] On appeal, the mother contends that the trial court erred in finding: (1) present clear and convincing evidence of parental misconduct or inability; (2) the causes of deprivation are likely to continue; (3) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children; and (4) termination of parental rights is in the children's best interests. Finding no error, we affirm.
1. As a threshold matter, we must address the inadequacy of the trial transcript. The court reporter was unable to understand much of what was said during the hearing, and the transcript reflects this.[2] For example, one exchange was documented by the court reporter as follows:
Q. Now, when was an order entered requiring [the mother] to pay child support?
A. (Inaudible)  for child support  (inaudible).
Q. Do you know  (inaudible).
A. I don't  (inaudible).
Q. Do you know when an actual order  (inaudible)  child support recovery  (inaudible) do you know when they entered their order?
A. No.
Pursuant to OCGA § 15-11-41(b), juvenile proceedings "shall be recorded by stenographic notes or by electronic, mechanical, or other appropriate means." Here, the proceeding was tape-recorded, which is an acceptable means of recordation.[3] However, the tape quality was so poor that the court reporter charged with transcribing the tape was unable to understand much of what was said during the hearing. Thus, portions of the transcript are useless.
"[W]here the transcript ... does not fully disclose what transpired at trial, the burden is on the complaining party to have the record completed in the trial court under the provisions of OCGA § 5-6-41(f)."[4] The mother's failure to complete the record has greatly impeded our review. Given the gravity of the issue presented, we will  to the best of our ability  attempt to discern what transpired below based upon the transcript available. Where the transcript is inadequate to address any claim of error, we will assume the trial court's ruling is correct and affirm.[5]
2. In reviewing a juvenile court's ruling terminating parental rights, we view the evidence in a light most favorable to the juvenile court's determination.[6] We affirm the lower court's ruling if the record demonstrates *715 that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[7]
Viewed in this manner, the record shows that in April 2001, two-year-old C.T.M. and six-year-old T.A.M. were taken into the custody of the Department of Family and Children Services ("DFCS") after the mother was jailed following a physical altercation with the children's maternal grandmother. The maternal grandmother reported to DFCS that the mother was verbally abusive to the children. In an order dated May 8, 2001, the juvenile court noted that the family was "currently under a child protective services plan for past allegations of neglect."
DFCS apparently implemented a reunification case plan that required the mother to attend parenting classes, obtain employment, and find suitable housing.[8] The mother failed to meet these requirements and, on June 12, 2001, the juvenile court found the children were deprived as a result of the mother's "failure to provide a stable home environment." The mother did not appeal from this order.
In October 2001, DFCS implemented a second reunification plan, which required the mother to, among other things, become "financially self-supportive," provide support for her children, and obtain "safe and stable housing." Specifically, the plan called for the mother to "obtain legal employment within 30 days and remain at that job for six consecutive months." The mother also needed to provide copies of her pay stubs to the DFCS case manager. The juvenile court incorporated the case plan into a subsequent order. Shortly thereafter, the mother entered a consent order, agreeing to pay $114 per child per month in support beginning December 1, 2001.
As of April 2002, the mother had not completed the goals of her case plan, and DFCS sought an order extending its custody of the children. Despite the mother's noncompliance, DFCS determined that reunification was still appropriate. But DFCS informed the mother via its petition that "if no progress is made on [the mother's] case plan [], the Department [would] consider non-reunification." On April 9, 2002, a third reunification plan was devised, which again required the mother to become financially self-supportive and maintain "safe and stable housing."
By September 2002, the mother had attended parenting classes and anger management classes, but she had not met any other goals of her case plan, including the goals that she obtain employment and stable housing. Accordingly, DFCS filed a motion to extend custody, noting its intention to seek termination of the mother's parental rights based upon her noncompliance with the case plan. The juvenile court subsequently entered an order extending custody and approving DFCS's "permanency plan," which included terminating the mother's parental rights.
While the children remained in DFCS custody, the mother was required to provide financial support. In February 2003, the mother was over $2,700 in arrears in child support payments. Thus, the juvenile court ordered the mother to pay $43.33 per month in arrears in addition to her ongoing obligation to provide support.
In March 2003, DFCS filed yet another deprivation petition, noting that the mother "failed to maintain adequate housing and employment." The juvenile court again found the children to be deprived and awarded DFCS custody of the children, with direction that the case be reviewed in six months. The order specified that the children might still be returned to their mother if she were to "establish adequate housing and [obtain] full time employment for 6 months."
The mother made progress with her case plan, obtaining both housing and employment. Thus, in September 2003, DFCS devised a fourth case plan with the goal of reunification. The plan noted that the mother had recently lost both her job and her housing following a car accident in which she *716 had broken her ankle. The mother apparently did not comply with this case plan, and in February 2004, DFCS filed yet another motion seeking court approval of a nonreunification plan. On March 9, 2004, the juvenile court approved the plan, which provided that DFCS would seek to place the children for adoption after the mother's parental rights were terminated.
DFCS ultimately filed a petition to terminate the mother's parental rights in April 2004, and a hearing was conducted on May 28, 2004. Connie Harp testified on behalf of DFCS at the hearing. According to Harp, during the three years the children had been in DFCS custody, the mother was never able to maintain stable housing or employment. Harp testified that in three years the mother had sixteen different residences, most often residing with friends or family. The record suggests that the mother worked sporadically, but there is no evidence that she was gainfully employed the majority of the time her children were in foster care.[9] The mother testified at the hearing and claimed that she had made all of her child support payments since February 2004. She also stated that she had done everything asked of her except obtain stable housing.
The juvenile court apparently did not believe the mother, and it terminated her parental rights. Specifically, the court found "that termination of [the mother's] parental rights would enable the children to achieve a more stable home life through adoption or other appropriate permanency plan." This appeal ensued.
The termination of a parent's rights involves a two-step process.[10] First, the juvenile court must determine whether there is
parental misconduct or inability, which requires clear and convincing evidence that:
(1) the child[ren][are] deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child[ren].[11]
Second, if the juvenile court finds that these four factors exist, the court determines whether termination of parental rights is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child ..., including the need for a secure and stable home."[12]
(a) According to the mother, the juvenile court erred in finding "present clear and convincing evidence of parental misconduct or inability." We disagree.
(i) The first factor that must be shown  deprivation  is proved by the prior deprivation orders, which the mother did not appeal.[13]
(ii) The next factor is whether lack of proper parental care or control caused the deprivation. In making this determination, the juvenile court may consider whether the parent failed, for one year or longer, "[t]o comply with a court ordered plan designed to reunite the child with the parent."[14] Here, the evidence shows that the mother complied with some of the case plan requirements. But she never managed to obtain stable employment and housing, notwithstanding the fact that she had three years in which to meet these goals. "While the mother's efforts to improve herself are good, the [juvenile] court must determine whether a parent's conduct warrants hope of rehabilitation, *717 not an appellate court."[15] Given that the mother failed to complete two of the most important goals of her case plan, the juvenile court was authorized to find by clear and convincing evidence that the mother's lack of parental care was the cause of the deprivation.[16]
(iii) Similarly, clear and convincing evidence supported the juvenile court's finding that the deprivation was likely to continue or was not likely to be remedied. In making this determination, the juvenile court was authorized to consider the mother's past conduct.[17] And a juvenile court may place more weight on "negative past facts" than promises of future conduct.[18] Here, the mother's failure to comply with case plan requirements for three years shows the deprivation was likely to continue.[19]
(iv) Finally, the juvenile court was authorized to conclude that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children.[20] "[I]t is well settled that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[21] Children cannot be kept in foster care limbo with no hope of any permanent future. At the time of the hearing, the children had been in foster care for three years and there was no indication the mother would ever be capable of providing a stable home environment. C.T.M. has spent well over half of his young life in foster care. Under the circumstances of this case, the juvenile court properly considered the children's need for permanence in making its ruling.[22]
(b) The mother also contends the juvenile court erred in concluding that termination of parental rights was in the best interests of the children. "The same factors which show[] the existence of parental misconduct or inability also support[] the finding that termination of [the mother's] parental rights [is] in the child[ren's] best interest[s]."[23] And, in looking at this prong, the juvenile court may consider the children's need for a stable home environment.[24] Given the length of time the children have been in foster care and the mother's perpetual inability to complete her case plan, we find that clear and convincing evidence supported the juvenile court's determination that termination was in the children's best interests.[25]
Judgment affirmed.
JOHNSON, P.J., and BARNES, J., concur.
NOTES
[1] The juvenile court also terminated the parental rights of the children's father, who has not appealed this ruling.
[2] The court reporter certified that she transcribed the proceeding from an audio recording that was of poor quality.
[3] See In the Interest of E.D.F., 243 Ga.App. 68, 69(2), 532 S.E.2d 424 (2000).
[4] (Punctuation omitted.) Bollinger v. State, 259 Ga.App. 102, 105(2), 576 S.E.2d 80 (2003).
[5] See Fluke v. Westerman, 271 Ga.App. 418, 420(1), 609 S.E.2d 744 (2005).
[6] See In the Interest of B.S., 274 Ga.App. 647, 649, 618 S.E.2d 695 (2005).
[7] See id.
[8] Although this case plan is not in the record, the juvenile court refers to the plan in its June 12, 2001 order.
[9] Although the mother testified regarding her various jobs, the transcript does not reflect the dates worked because the court reporter was unable to comprehend the mother's testimony. The juvenile court found that the mother failed to establish adequate employment, and, given the state of the transcript, we are unable to gainsay this finding.
[10] See OCGA § 15-11-94(a); In the Interest of A.M., 275 Ga.App. 630, 631, 621 S.E.2d 567 (2005).
[11] In the Interest of A.M., supra.
[12] OCGA § 15-11-94(a).
[13] See In the Interest of B.J.F., 276 Ga.App. 437, 439(1)(a), 623 S.E.2d 547 (2005).
[14] OCGA § 15-11-94(b)(4)(C)(iii).
[15] (Punctuation omitted.) In the Interest of B.J.F., supra at 441(1)(b), 623 S.E.2d 547.
[16] See id.
[17] See In the Interest of N.G., 257 Ga.App. 57, 61, 570 S.E.2d 367 (2002).
[18] See In the Interest of B.S., supra at 651(2), 618 S.E.2d 695.
[19] See id.; In the Interest of T.W., 255 Ga.App. 674, 677(2), 566 S.E.2d 405 (2002).
[20] See In the Interest of B.J.F., supra at 442(1)(d), 623 S.E.2d 547.
[21] In the Interest of A.B., 274 Ga.App. 230, 232, 617 S.E.2d 189 (2005).
[22] In the Interest of B.J.F., supra; In the Interest of B.S., supra at 651-652(3), 618 S.E.2d 695.
[23] In the Interest of B.J.F., supra at 443(2), 623 S.E.2d 547.
[24] See In the Interest of T.W., supra at 678(4), 566 S.E.2d 405.
[25] See id.