A06A0608. IN THE INTEREST OF A. C. et al., children.
(633 SE2d 609)

RUFFIN, Chief Judge.

The juvenile court terminated the natural mother's parental rights to A. C., J. C., and R. C.[1] On appeal, the mother contends that the juvenile court erred in terminating her rights absent clear and convincing evidence of parental misconduct. The mother also argues that the juvenile court improperly applied the "best interest" test and terminated her parental rights solely on the basis that to do so was in the children's best interests. Finding no such error, we affirm.

In reviewing a juvenile court's ruling terminating parental rights, we view the evidence in a light favorable to the juvenile court's determination.[2] We will affirm the lower court's ruling if the record demonstrates that any rational trier of fact could have found by clear and convincing evidence that the parent's right to custody has been lost.[3]

Viewed in this light, the record shows that the mother has several medical problems, including cerebral palsy, scoliosis, and a seizure disorder. She also has a history of being involved in abusive relationships. Initially, the mother was married to a "Mr. Paul" with whom she had two children. According to the mother, he abused her. The mother also had a child by another man, Joseph Tate. The mother relinquished her parental rights to these three children.

The mother subsequently met and married the father of A. C., J. C., and R. C. At one point, while the family was living in California, the children were removed from the home because of "deplorable" conditions. According to the mother, the father abused both her and the children. When asked if she ever reported the abuse, the mother responded, "[n]o sir, I was very scared, very frightened of [the father], of what he might do to me." Ultimately, the mother left the children's father.[4] The mother then relocated from California to Georgia.

The Department of Family and Children Services ("DFCS") became involved with the mother when it received reports that the mother was unemployed and failed to provide suitable food and

---

[1] In a prior order, the court terminated the rights of the children's biological father.

[2] See *In the Interest of B. S.,* 274 Ga. App. 647, 649 (618 SE2d 695) (2005).

[3] See id.

[4] The record indicates that the children's father was deported to Guatemala.

clothing for her children, did not obtain needed medical care for J. C., and maintained an unsanitary residence. DFCS also noted in the report that the mother "has a seizure disorder and is the sole caregiver with no support system." The children were taken into protective custody, after which J. C. was hospitalized for four days.

DFCS filed a deprivation petition, and the juvenile court conducted a hearing on December 30, 2003. The juvenile court found the children were deprived and awarded temporary custody to DFCS. In its order, the court noted that the plan was to reunite the children with their mother and that DFCS was to prepare a case plan accordingly.

DFCS prepared the plan, which required the mother to, inter alia: (1) obtain and maintain a source of income; (2) obtain and maintain suitable and sanitary housing; (3) follow recommendations for medical and mental health needs; and (4) take all prescribed medications. The juvenile court adopted the plan in an order dated January 20, 2004.

Shortly thereafter, the mother met with a citizen review panel and on March 22, 2004, the juvenile court entered an order noting that the "[m]other has made minimal progress on the case plan. No support has been paid at this point." As part of the order, the court required the mother to undergo a psychological evaluation and a parenting assessment. The psychologist who evaluated and tested the mother diagnosed her with chronic post-traumatic stress disorder and a generalized anxiety disorder. Specifically, the psychologist found that the mother "tends to be histrionic, immature and self-centered, and she needs much attention from significant others."

After A. C., J. C., and R. C. were removed from the mother's home, she married another man on August 27, 2004 and became pregnant again. DFCS attempted to meet with the mother's new husband and obtain information about him, including a fingerprint card, but was unable to obtain the information. Upon discovering pregnancy, the mother stopped taking her seizure medication.

The mother did not comply with her case plan, and DFCS filed a petition to terminate her parental rights. Of note, DFCS alleged that the mother failed to contribute to the financial support of the children and was unable to provide an adequate home for the children. On February 22, 2005, the juvenile court conducted a hearing. At the hearing, the mother initially testified that she recently learned about the support obligation and that she paid $70 toward support shortly before the hearing. When questioned further, however, the mother conceded that she "knew about the support," but did not have any income. According to the mother, she had worked only two months since the children were removed from her home and that was the only job she had held in over seven years. The mother's sole source of

income was her husband's paycheck. Although she applied for social security disability benefits, the claim was denied. With regard to housing, the mother testified that she and her new husband had obtained suitable housing two months before the hearing.

DFCS also presented evidence that termination of the mother's parental rights was in the children's best interests. Specifically, Dr. Patricia Wright, a child psychologist, testified that she had seen the children and that all three girls would benefit from being placed permanently with their foster family. According to Wright, A. C., who was six when taken into DFCS custody, suffered from post-traumatic stress as a result of sexual abuse by a stepsibling and neglect she had experienced while in her mother's care. Wright testified that she first saw J. C., who was five when DFCS intervened, when the child began demonstrating signs of anxiety and defecating on herself following a visit with her biological mother. With respect to R. C., who was one when she was taken into DFCS custody, Wright stated that the child exhibited symptoms such as increased nightmares following a visit with the mother.

The children's foster mother, Connie Locke, testified at the hearing. According to Locke, the children were placed with her family because her husband is related to the mother. Locke stated that all three girls were doing "great" in her home and that A. C. and J. C. had shown much academic improvement. Locke also testified that she and her husband wanted to adopt the girls.

Following the hearing, the juvenile court declined to terminate the mother's parental rights at that time, ordering instead that the reunification plan be continued for another six months. Specifically, the court ordered that "[t]he mother will be required to show strict compliance with her case plan goals during this time, and will be required to complete ALL case plan goals."

The mother did not comply fully with the plan, and a second hearing was held on August 23, 2005. Once again, Wright testified regarding the girls, whom she treated following the February hearing. Wright said that all three children would require continued treatment and that, in her opinion, the girls required a "safe, stable, secure home life." Locke also testified, and reiterated that the girls appeared happy in her home.

Dana Harris, a DFCS case manager, testified that she was asked to help the mother complete her case plan. According to Harris, she had difficulty scheduling meetings with the mother and the mother had failed to provide documentation that she requested, including information regarding the mother's new husband such as fingerprint

cards and a marriage certificate.[5] The mother testified that she had not gotten the fingerprint card for her current husband since he "was working a lot of overtime hours[,]" but that if her inaction was a problem, she would "be glad to go and do that today." When asked about her employment status, the mother testified that she had tried to work,

> but the job was more strenuous for [her] and [her] body, and [she did not] feel like putting stress on [her] body to the point that [she] can't do things that [she is] supposed to do as a mother and a wife. [She] prefer[s] to keep [herself] non stressful because the disorder that [she] had prior when [she] was taking the medication is due to stress so [she] prefer[s] not to stress [herself] out. [She] prefer[s] to exercise daily [and] eat adequate . . . meals.

The mother was questioned about obtaining a more sedentary job, and she said she had "not because [she did] not know of any work around in that area that you can get and sit." When asked if she had considered going to the unemployment office, the mother testified that she had not. Although she claims she had "thought" about going, she "just [had not] gotten around to going to them yet." The mother also admitted that she had failed to pay any support since the $70 payment she made shortly before the February hearing, claiming that she was unaware of the court's order specifying the amount of her support obligation.[6]

Following this hearing, the juvenile court terminated the mother's parental rights. In its order, the juvenile court noted that the mother had not paid any support since before the February hearing. With respect to the mother's claim that she did not know the amount to pay, the court found "[t]his is incredulous, as is much of the mother's testimony. . . . The mother states that she can not physically work, then states that she 'thought about going to the employment office' (to look for work), but says that she 'just hasn't gotten around to it.'" The court further noted the mother's failure to provide information to DFCS regarding her new husband and questioned the mother's ability to parent the three girls given that she was apparently too busy to comply with her case plan.

---

[5] There appears to be a question as to whether the mother legally divorced her second husband, the children's father. Although the mother stated that a nonlawyer filed paperwork on her behalf, she admittedly had never gone before a judge and never produced the divorce decree for DFCS.

[6] DFCS tendered a January 2004 order from the juvenile court, setting forth that the mother was required to pay $5 per week.

1. The mother appeals the juvenile court's ruling, arguing that her "parental rights were terminated without clear and convincing evidence of parental misconduct or inability." We disagree.

The termination of a parent's rights involves a two-step process.[7] First, the juvenile court must determine whether there is

> parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) lack of proper parental care or control is the cause of the deprivation; (3) such cause of deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[8]

If the juvenile court finds these four factors exist, then the court determines whether termination of the parent's rights is in the best interests of the children, "after considering the physical, mental, emotional, and moral condition and needs of the child[ren], including the need for a secure and stable home."[9]

(a) Here, the mother contends that there is no evidence of deprivation and seems to suggest that the juvenile court never entered a deprivation order. However, in its earliest detention order, the juvenile court clearly found the children to be deprived. The mother provides no legal citation to support her novel argument that such order must be labeled "Deprivation Order" to have legal effect. Indeed, "there is no magic in nomenclature; thus, in classifying the order of a trial court, we will construe it to serve the best interests of justice, judging the order by its function rather than by its name."[10] And, as the mother did not appeal from the order in which the juvenile court found the children to be deprived, she is bound by the prior finding of deprivation.[11]

(b) The juvenile court was also authorized to find that lack of proper parental care and control caused the deprivation. "In making this determination, the juvenile court may consider whether the parent failed, for one year or longer, to comply with a court ordered

---

[7] See OCGA § 15-11-94 (a); *In the Interest of A. M.*, 275 Ga. App. 630, 631 (621 SE2d 567) (2005).

[8] (Punctuation omitted.) *In the Interest of C. T. M.*, 278 Ga. App. 297, 301 (2) (628 SE2d 713) (2006).

[9] (Punctuation omitted.) Id.

[10] (Punctuation omitted.) *Studenic v. Birk*, 260 Ga. App. 364, 366-367 (1) (579 SE2d 788) (2003).

[11] See *In the Interest of D. D.*, 273 Ga. App. 839, 840 (2) (616 SE2d 179) (2005).

plan designed to reunite the child with the parent."[12] Here, the mother points to her successes, arguing that she now "lives in a spacious home and her husband's income is sufficient to support the entire family." But the mother never complied *fully* with the case plan. Even after being informed by the juvenile court following the February 2003 hearing that full compliance was required, she chose to ignore several important requirements, including that she — not her husband — obtain employment. The mother's equivocal testimony in this regard suggests that she never intended to fulfill this requirement.

And the mere fact that the mother claims to have married someone capable of supporting her family does not obviate the case plan requirement. The mother has a history of involving herself with unsuitable and abusive men. Thus, the mother's current involvement with a man does not automatically render her new home suitable for A. C., J. C., and R. C. We note that the mother never provided DFCS with requested information about her new husband, whom the caseworkers never met. Given the mother's history of poor relationship choices, the juvenile court was not required to accept her self-serving testimony regarding her current relationship.

We acknowledge that the mother apparently made some progress with her case plan. Indeed, the caseworker who visited the mother's present home testified that the home was neat and she noticed no safety hazards. And "[w]hile the mother's efforts to improve herself are good, the [juvenile] court must determine whether a parent's conduct warrants hope of rehabilitation, not an appellate court."[13] In view of the mother's failure to complete a major component of her case plan, the juvenile court properly found that the mother's lack of parental care caused the children's deprivation.[14]

(c) Furthermore, clear and convincing evidence supported the juvenile court's finding that the deprivation was likely to continue or was not likely to be remedied.[15] "In making this determination, the juvenile court was authorized to consider the mother's past conduct. And a juvenile court may place more weight on 'negative past facts' than promises of future conduct."[16] Given the mother's failure to

---

[12] (Punctuation omitted.) *In the Interest of C. T. M.*, supra at 301 (a) (ii).

[13] (Punctuation omitted.) *In the Interest of B. J. F.*, 276 Ga. App. 437, 441 (1) (b) (623 SE2d 547) (2005).

[14] See id.

[15] See *In the Interest of N. G.*, 257 Ga. App. 57, 61 (570 SE2d 367) (2002).

[16] (Footnote omitted.) *In the Interest of C. T. M.*, supra at 302 (2) (a) (iii).

comply with the case plan over the course of almost two years, the record supports the juvenile court's finding that the deprivation was likely to continue.[17]

(d) We also cannot gainsay the juvenile court's ruling that the deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children.[18] Dr. Wright's testimony that the children's psychological problems and their need for a stable home environment certainly supports the juvenile court's ruling.[19] On appeal, the mother argues that Wright's testimony was so biased as to be unworthy of belief. However, this Court does not determine issues of witness credibility, and we defer to the juvenile court's factual findings.[20] Accordingly, this argument presents no basis for reversal.

2. In her final enumeration of error, the mother argues that the "court erred by reaching the best interest analysis and by then terminating the [mother's] parental rights solely [on] the basis that to do so would serve the children's best interest." In other words, the mother claims that the record did not support the finding of parental misconduct or inability and thus the trial court was not authorized to proceed to the best interest analysis.[21] For reasons discussed in Division 1, however, the record did support the juvenile court's finding of parental misconduct or inability. It follows that this enumeration of error lacks merit.

*Judgment affirmed. Smith, P. J., and Phipps, J., concur.*

DECIDED JUNE 29, 2006.

*Rodney Q. Quarles*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General*, for appellee.

---

[17] See id.; *In the Interest of B. S.*, supra at 650-651 (2).

[18] See *In the Interest of B. J. F.*, supra at 442 (1) (d).

[19] See *In the Interest of D. L. S.*, 271 Ga. App. 311, 314 (1) (d) (609 SE2d 666) (2005).

[20] See *In the Interest of C. M.*, 275 Ga. App. 719, 719-720 (621 SE2d 815) (2005).

[21] See *In the Interest of C. T. M.*, supra (if parental misconduct or inability exists, then trial court determines if termination is in children's best interests).