609 S.E.2d 666 (2005)
271 Ga.App. 311
In the Interest of D.L.S. et al., children.
No. A05A0375.
Court of Appeals of Georgia.
January 20, 2005.
*667 Harold Wallace, Thomson, for Appellants.
Thurbert Baker, Attorney General, Shalen Nelson, Senior Assistant Attorney General, Thomas Hammond, Thomson, for Appellee.
BLACKBURN, Presiding Judge.
Following the termination of their parental rights to their four children, the natural parents of D.L.S., R.L.S., K.L.S., and N.S. appeal, challenging the sufficiency of the evidence. Because evidence supported all relevant factors for termination, we discern no error and affirm.
The following standard applies when parents challenge the sufficiency of the evidence in a termination rights case:
On appeal, we must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.
In the Interest of R.W.[1]
Construed in favor of the judgment, the evidence shows that D.L.S. and R.L.S. were removed from their parents' custody in 1999 due to extreme neglect and unsafe living conditions over a lengthy period of time that resulted in the children's homelessness, various infections, lice infestation, and extremely *668 poor hygiene, with the father requesting that the State place at least one of the children for adoption. The parents consented to the order finding deprivation and placing the children in State custody. The case plan ordered by the court required the parents to obtain stable employment and housing by December 2000 and to cooperate with the Department of Family and Children Services (DFACS). K.L.S. was then born, and she was eventually placed in State custody due to the parents' continued failure to obtain stable housing and employment and due to the same extreme neglect that had been experienced by the older children. Immediately after a fourth child (N.S.) was born, he was also taken into State custody based on the parents' proven neglect of the other three children (still in State care). Over the years, the parents appealed none of the deprivation orders.
Nor did the parents comply with the reunification plan. Moving from place to place, including stints in motels and cars, the parents obtained no stable employment nor housing (even though DFACS supplied them with over $8,000 in assistance funds to establish housing), with the father once quitting a good job that was also supplying him and the mother with housing. The parents failed to cooperate with DFACS, repeatedly neglecting to inform DFACS of key information, such as their frequent changes in address, and at times intentionally misrepresenting their homelessness to DFACS. Because of the constant shifting of housing circumstances and the lack of information from the parents, DFACS had an extremely difficult time maintaining contact with the parents.
The parents' visits with the children while in State custody were problematic. During those visits, the parents would shut out the children emotionally or would allow them to do unsafe acrobatic movements off of rocking chairs and couches, paying no attention to the one-year-old playing with an electrical cord, and at times encouraging one daughter to act out sexually suggestive movements. They encouraged the children to throw things, with the result that the visits were completely chaotic. When a caseworker confronted the parents with an act of stealing by the oldest child, the parents showed no concern. Because of financial concerns, the father eventually announced that he wanted to voluntarily surrender his rights to at least three of the children, with the mother protesting such a surrender.
The impact of the parents' visits with the children was quite traumatic, with the oldest child crying and, during one visit, even crawling under a table and refusing to come out. After the visits, the children became defiant, had nightmares, and wet the bed. When at the recommendation of a psychologist the visits ceased, the children's behavior improved. Later, when the visits resumed, the children's behavior again deteriorated, with some of the children acting aggressively and argumentatively, fighting, hitting teachers, throwing fits and temper tantrums, and exhibiting extreme anger. One child would "shut down" emotionally after such visits, becoming listless and putting her head down to avoid contact with others. The older children earnestly requested that they no longer be required to visit with the parents.
The State sought approval for a nonreunification plan, and at the time of the hearing on this plan, the parents continued to have no stable housing or employment. The plan was approved, and the State petitioned for termination of parental rights. Following a trial, the court ordered the parents' rights terminated, which ruling they appeal.
Our duty on appeal is clear:
Construing the evidence most favorably to the findings of the court, the question on appeal is whether a rational trier of fact could have found clear and convincing evidence (a) of parental misconduct or inability and (b) that terminating parental rights was in the best interest of the child. Parental misconduct or inability is shown by evidence (i) the child is deprived, (ii) lack of parental care caused the deprivation, (iii) such is likely to continue, and (iv) the continued deprivation is likely to cause serious harm to the child.
In the Interest of L.S.D.[2]
1. Regarding parental misconduct or inability, we address each of the four factors.
*669 (a) Deprivation. None of the various orders finding the children to be deprived was appealed. Accordingly, the parents were bound by these findings for purposes of the termination hearing. In the Interest of M.L.[3] See In the Interest of E.C.[4]
(b) Lack of Parental Care or Control. Evidence showed that lack of parental care or control by the parents was the cause of the children's continued status as deprived. Since the children have been in the custody of the State, we will consider whether the parents failed to develop and maintain a parental bond with the children in a meaningful, supportive manner, and whether the parents failed to comply with their court-ordered reunification plan.[5]
The negative and traumatic impact of the parents' visits on the children demonstrates the lack of a proper parental bond with the children. See In the Interest of J.P.[6] ("nightmares and tantrums following visits with appellant dispels the notion that appellant maintained a meaningful and supportive parental bond with his children"). And, the parents failed miserably at meeting the specified goals of the court-ordered reunification plan: stable housing, stable employment, and cooperation with DFACS. Over the period of three years, they changed residences on numerous occasions, at times living in a motel or in their car. They were for the most part unemployed, with the father admitting that he could not afford to parent the children and asking the State at one point to place the children for adoption. They kept information from DFACS, even misrepresenting address information to DFACS when they thought it would help their situation. Evidence supported a finding of lack of parental care or control.
(c) Lack of Care or Control Likely to Continue."Evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the children are returned to their parents." In the Interest of A.A.[7] Here, the parents' history of unstable housing and unemployment, combined with their poor parenting skills manifested in their chaotic and traumatic visits with the children, authorized the juvenile court's finding that the lack of proper parental care or control was likely to continue.
The parents, however, claim that they have reformed, pointing to evidence of recent housing and employment. Such improvements are not conclusive of parental fitness in light of their prior history. M.L., supra at 536(1)(c), 578 S.E.2d 190. "A few months of partial stability do not establish that the parent is capable of maintaining the progress." (Punctuation omitted.) L.S.D., supra at 628, 534 S.E.2d 109. Also, the parents had no stable housing or employment prior to the nonreunification hearing, which was soon followed by the termination petition. Improvement that takes place only after the termination petition is filed is often unconvincing. Id. Finally, "in considering recent improvement, the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Punctuation omitted.) Id. See In the Interest of A.M.L.[8] We hold that a rational trier of fact could have found clear and convincing evidence that the parents' misconduct was likely to continue.
(d) Serious Harm to the Children. The same evidence authorized the juvenile court to find that the continued deprivation would likely cause serious physical, mental, emotional, or moral harm to the children. M.L., supra at 536(1)(d), 578 S.E.2d 190. The continued relationship and visits with the parents detrimentally affected the children, some of whom were asking that they no longer be required to visit with the parents. Two caseworkers and a psychologist testified *670 that the children, two of whom were special-needs children, were in desperate need of stability and security, which would not occur so long as they continued to experience the emotional upheaval of impermanent foster care and the adverse visits with the parents. Evidence supported the juvenile court's finding of serious harm to the children.
2. Regarding best interests of the children, we hold that the evidence showing the existence of parental misconduct or inability also supported a finding that the termination of the parents' parental rights would be in the children's best interests. A.M.L., supra at 124(2), 527 S.E.2d 614. Beyond the parents' causing psychological damage to the children by their visits, evidence showed that the children were doing well in the custody of DFACS and would benefit from the stability of staying with the loving foster parents. Id. See OCGA § 15-11-94(a) (court may consider children's need for a secure, stable home); In the Interest of H.H.[9]
Because a rational trier of fact could have found clear and convincing evidence of parental misconduct or inability and could have found further that termination was in the best interests of the children, the juvenile court did not err in terminating the parents' parental rights to the children. M.L., supra at 537(2), 578 S.E.2d 190.
Judgment affirmed.
MILLER and BERNES, JJ., concur.
NOTES
[1] In the Interest of R.W., 248 Ga.App. 522(1), 546 S.E.2d 882 (2001).
[2] In the Interest of L.S.D., 243 Ga.App. 626, 534 S.E.2d 109 (2000).
[3] In the Interest of M.L., 259 Ga.App. 534, 535(1)(a), 578 S.E.2d 190 (2003).
[4] In the Interest of E.C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997).
[5] OCGA § 15-11-94(b)(4)(C).
[6] In the Interest of J.P., 268 Ga.App. 32, 37(1)(a), 601 S.E.2d 409 (2004).
[7] In the Interest of A.A., 252 Ga.App. 167, 172(2)(c), 555 S.E.2d 827 (2001).
[8] In the Interest of A.M.L., 242 Ga.App. 121, 124(1)(c), 527 S.E.2d 614 (2000).
[9] In the Interest of H.H., 257 Ga.App. 173, 176(1)(b), 570 S.E.2d 623 (2002).