A06A1811. IN THE INTEREST OF J. F., a child.
(642 SE2d 434)

JOHNSON, Presiding Judge.

This is an appeal from a juvenile court's order terminating the mother's parental rights to J. F., a five-year-old child. The evidence presented at the parental rights termination hearing revealed the following: J. F. lived with Anita Ogle. The mother left J. F. with Ogle in 2003, and Ogle sought and received legal custody of the child on February 3, 2004. On May 19, 2005, the Polk County Department of Family and Children Services (hereinafter "the Department") received a report that the mother had illegally removed J. F. from his legal guardian's home and, while intoxicated, led police on a high-speed chase into Alabama, where she was arrested. The child was placed in protective custody, and the juvenile court conducted a detention hearing. The mother did not appear for the hearing because she was incarcerated.

---

On June 16, 2005 the juvenile court conducted a deprivation hearing. The court found that (1) in 1999 the mother had her parental rights to five other children terminated by the Gordon County Juvenile Court, (2) in June 2004 the mother unlawfully removed J. F. from his legal guardian's home, fled with the child across state lines, and was subsequently arrested, (3) in April 2005 the mother was incarcerated again for a probation violation, (4) in May 2005 the mother again removed J. F. from his legal guardian and fled with the child to Alabama, where she led police on a high-speed chase while under the influence of alcohol and was subsequently arrested, and (5) the mother was incarcerated in Polk County at the time of the deprivation hearing. Based on these findings of fact, the juvenile court declared J. F. deprived, placed the child in the Department's custody and approved reunification with the mother. That order was not appealed.

On June 22, 2005, the Department developed and filed a reunification case plan under which the mother was required to obtain a substance abuse assessment and psychological evaluation and follow all treatment recommendations, submit to random drug screens, remain drug/alcohol free for a minimum of six months, maintain stable housing and income, complete parenting classes, attend all hearings, appointments and visitations, notify the Department of all changes in address, provide the names of relatives, and contact the Department to discuss case plan progress. The mother signed the case plan, and the goals were incorporated into the juvenile court's order.

On October 25, 2005, the Department filed a petition to terminate the mother's parental rights. While the case was pending, the case manager filed a report indicating that the mother had failed to comply with her case plan goals, and the child advocate filed a report recommending adoption as the permanent plan. The mother was incarcerated and not present for the hearing, but she was represented by counsel. The parties stipulated to allowing the deposition transcript of Dr. Baldwin into evidence and to the filing of an affidavit by the mother noting her wishes.

Dr. Suzanne Fischer, a licensed clinical psychologist, testified that she conducted a psychological evaluation of the mother on November 15, 2005 at the Polk County jail. The mother had difficulty detailing her history, appeared to be masking some depression, did not take responsibility for various events, and blamed J. F.'s father for all her problems. The mother admitted she was "guilty of drinking," had gone to residential treatment for six months in the past, but had not made any other attempts to become sober. Initially, the mother denied using drugs, but later admitted that she used methamphetamine and cocaine at various points in time. She also conceded she

had been in and out of jail several times, had no home to return to upon her release, and had no significant work experience. The mother denied knowing J. F. was not in her legal custody when she fled with the child, but later admitted she knew the child was in Ogle's legal custody when she absconded with him in 2004 and 2005. The first time she took the child, she tried to flee to Wyoming, but was caught and arrested in Nebraska. The second time she took the child she was arrested in Alabama after a high-speed chase with police. The mother stated that she had eight other children, had given custody of the oldest to her parents despite knowing that her father was abusive and her mother was an alcoholic. Two other children had aged out in foster care, and the Gordon County Juvenile Court had terminated her parental rights to five other children.

Dr. Fischer further testified that the mother scored in the average range of intelligence, but that her personality test could not be scored because she failed to complete the test. Dr. Fischer diagnosed the mother with alcohol dependence, early partial remission, amphetamine abuse and cocaine abuse. She also diagnosed her with dependent and self-defeating personality traits based upon her admitted history of repeatedly returning to J. F.'s abusive father. According to Dr. Fischer, the mother did not learn from past mistakes, was subservient or submissive, and was not likely to act in a protective way, noting that the mother had never lived on her own, worked or been self-sufficient. Dr. Fischer concluded that the mother's tendency to return to her previous experiences and inability to separate herself from her substance abuse issues and J. F.'s father negatively impacted her ability to parent. She noted that the mother would need in excess of two years of weekly treatment to reach a point where she could care for herself and even longer to become able to care for someone else. Dr. Fischer recommended that the juvenile court terminate the mother's parental rights. She opined that J. F. would experience the same chronic instability from the past if he were returned to the mother and that permanency and stability were very important to the child's well-being. She further stated that without permanency, J. F. could become depressed, anti-social, delinquent, suffer serious psychiatric disability, and be unable to interact with or relate to others.

Ogle, the child's former legal guardian, testified that she first became involved with J. F. in 2003 when the mother left him with an older sibling who lived in her home. Ogle is not related to the mother, and she unsuccessfully looked for relatives with whom to place the child. Ogle did not allow the mother to take the child when she returned intoxicated a few days later. She subsequently received a phone call that the mother had been incarcerated. Ogle then petitioned for custody of J. F. and was granted custody in February 2004.

From the end of 2003 through February 2004, the mother was incarcerated and had no contact with J. F. Ogle informed the mother that she had legal custody of J. F. and that the mother was court-ordered not to have any unsupervised visits. During the next year, Ogle allowed J. F. to spend occasional evenings with the mother, but the mother either drank in front of the child or was arrested for various offenses. In June 2005, Ogle released custody to the Department because she could no longer care for J. F.

Ogle testified that the mother had not made any positive changes since 2003 and that the mother was unable to parent the child. The mother never provided any support or gifts to the child and was incarcerated about 70 percent of the time between 2003 and 2005. According to Ogle, the mother did not feed the child properly, allowed the child to do whatever he wanted regardless of safety concerns, and failed to ensure the child maintained proper hygiene. She opined that the mother was unable to grasp what it meant to be a parent, was an alcoholic, was co-dependent on the father, and that it was in J. F.'s best interest to terminate the mother's parental rights.

The Department's case manager testified that J. F. was placed in foster care on May 20, 2005 after the mother absconded with him to Alabama and was arrested following a police chase while driving under the influence of alcohol. J. F. appeared underfed, dirty, and had holes in his clothes when he was first placed in foster care. According to the case manager, the mother had been ordered in 2004 to obtain substance abuse treatment, but had not followed through on that order. The mother also had not gone to parenting classes, failed to maintain a stable home or income, and had not complied with case plan goals. The caseworker expressed concern that J. F. was five years old, had already been out of the mother's custody for two years, and was adoptable at present. However, if the Department waited too much longer for the mother to comply with case plan goals, the child would end up in long-term foster care.

The case manager further testified that J. F. had some behavioral issues when he first entered foster care, but he had improved greatly. She saw J. F. on a regular basis and noted that he never asked about his mother, except for one occasion in 2005 when he asked if she were still in jail. The case manager opined that J. F. needed permanency and a stable home, and she recommended that the mother's parental rights be terminated. The Department has been unable to locate any relatives suitable for placement and has not identified any adoptive placement for the child.

A licensed professional counselor conducted a first placement/best placement evaluation of the family in June 2005. She met with the mother in jail, where the mother admitted that she and J. F.'s father moved frequently and often lived out of their car to avoid the

Department. She also admitted taking J. F. from Ogle's home to Nebraska and admitted she had been arrested for driving under the influence of alcohol on at least two occasions. The mother further admitted she had an affair with J. F.'s father's brother, and the father killed him. She blamed the father for her problems, but chose not to separate from him. The counselor opined that the mother's behaviors strongly indicated that she would repeat her past behavior and that she had not obtained any viable parenting skills. She did not believe that the mother would be capable of taking care of J. F. any time in the immediate future and estimated the mother would need at least 24 months to become able to care for J. F.

The counselor's interview with J. F. indicated that he had not bonded to any one caregiver and would have abnormal attachment problems without a stable placement. She observed J. F. at daycare, where he displayed aggressive, defiant and destructive behaviors, did not exhibit any guilt after misbehaving, and did not respond to punishment. According to the counselor, J. F. would be harmed if he remained in transient foster placement for the next 24 months while the mother addressed her problems.

The guardian ad litem recommended that the juvenile court terminate the mother's parental rights as being in the child's best interest. The court-appointed special advocate also recommended termination of the mother's parental rights.

The mother submitted an affidavit stating that she expected to be released from jail in March 2006, that she wanted an opportunity to be reunited with J. F., and that she opposed the termination of her parental rights. On February 1, 2006, the trial court issued an order terminating the mother's parental rights. The mother appeals, alleging the evidence was insufficient to show that she was an unfit mother and that termination of her parental rights was in J. F.'s best interest. We find no error and affirm the termination of the mother's parental rights.

A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[1] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's

---

[1] OCGA § 15-11-94 (b) (4) (A) (i)-(iv).

physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[2]

In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the juvenile court's disposition and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody should be terminated.[3] In so doing, we do not weigh the evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[4]

a. Deprivation: The juvenile court previously determined that J. F. was deprived and entered a deprivation order to that effect. The order was not appealed and was entered into evidence at the termination hearing without objection. The mother, therefore, is bound by the juvenile court's prior findings of deprivation.[5]

b. Lack of proper parental care or control by the mother caused J. F.'s deprivation: In determining whether a child is without proper parental care or control, the juvenile court may consider

> excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotics or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child.[6]

The evidence presented at the termination hearing clearly demonstrated that the mother has a medically verifiable deficiency of her mental and emotional health which renders her unable to provide adequately for the needs of the child.[7] She has been diagnosed with alcohol dependency, amphetamine abuse, cocaine abuse and self-defeating personality traits. She blames others for her problems and has done very little since 1995 to change for the better. Experts testified that these traits negatively impacted her ability to parent. According to two experts, the mother would need a minimum of twenty-four months before she could care for herself and J. F.

---

[2] OCGA § 15-11-94 (a).

[3] *In the Interest of S. L. B.*, 265 Ga. App. 684, 687 (1) (595 SE2d 370) (2004).

[4] Id. at 684.

[5] See *In the Interest of A. K.*, 272 Ga. App. 429, 434 (1) (a) (612 SE2d 581) (2005); *In the Interest of C. R. G.*, 272 Ga. App. 161, 164 (611 SE2d 784) (2005).

[6] (Punctuation and footnote omitted.) *In the Interest of J. L.*, 269 Ga. App. 226, 229 (1) (603 SE2d 742) (2004); see also OCGA § 15-11-94 (b) (4) (B) (ii).

[7] See OCGA § 15-11-94 (b) (4) (B) (i).

The evidence at the termination hearing also showed that the mother's actions, both before and after J. F. was placed in foster care, constituted physical, mental, or emotional neglect[8] and showed that the mother failed to develop and maintain a parental bond with J. F.[9] The mother left J. F. with Ogle, a person with whom she had no relationship. Ogle noted that when J. F. visited his mother, he was not fed well, could do whatever he wanted without regard to safety concerns, and had poor hygiene. Twice the mother absconded with J. F. over state lines, once leading police on a high-speed chase while she was driving under the influence of alcohol and J. F. was in the car. In addition, during the time J. F. was in foster care, the mother never provided any financial support for him[10] and failed to visit him or request any visits. At the time of the termination hearing on January 4, 2006, the mother had not seen J. F. in seven months, had not paid any child support, had done nothing to address her substance abuse problems, had not secured a permanent home or employment, and was still incarcerated.

While the mother argues that the Department has not provided her with any services or given her adequate time to comply with her case plan goals, the record shows that in February 2004 a court ordered her to obtain drug treatment, maintain employment and housing, attend parenting classes, visit J. F., and pay child support. None of these case plan goals were met. Moreover, the mother's inability to comply with the case plan goals is attributable to her criminal conduct rather than any alleged failure by the Department. In addition, the involuntary termination of the mother's parental rights to five of her other children creates the presumption that reunification services would be detrimental to J. F.[11] The juvenile court correctly found that J. F. was deprived and his mother's unfitness was the cause of that deprivation.

c. The cause of the deprivation is likely to continue: It is well established that a juvenile court may consider past conduct of the parent in making its determination that such conditions of deprivation are likely to continue.[12] All the experts agree that the mother's behavior strongly indicates that what she has done in the past would continue in the future. She has not addressed her substance abuse problems, she has not separated from J. F.'s father, whom she blames for her problems, she has not obtained any viable parenting skills, and she has not obtained stable housing or employment. In addition,

---

[8] OCGA § 15-11-94 (b) (4) (B) (v).
[9] OCGA § 15-11-94 (b) (4) (C) (i).
[10] OCGA § 15-11-94 (b) (4) (C) (ii).
[11] OCGA § 15-11-58 (h).
[12] See *In the Interest of T. B.*, 267 Ga. App. 484, 486 (1) (600 SE2d 432) (2004).

the mother's repeated jail incarcerations indicate a likelihood of continued deprivation.[13] And, evidence that the mother had eight other children who were not in her care or support indicates that she would be unable to care for J. F.[14] The evidence sufficiently supported the juvenile court's determination that the child's deprivation was likely to continue because of the mother's unfitness.

d. Continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child: The evidence presented during the termination hearing also supports the juvenile court's finding that the continued deprivation would cause serious harm to J. F. The mother's repeated failure to remain drug or alcohol free, her failure to take the steps necessary to reunite with J. F., and J. F.'s need for a stable home were sufficient to prove that the continued deprivation would cause J. F. serious harm.[15] It is well established that children need a permanent home and are likely to suffer emotional problems if they do not have a permanent home or emotional stability.[16] And, a caseworker's testimony about the need for permanence and injury to the child may be considered by the juvenile court.[17] Here, more than one expert testified that J. F. needs a stable home and is likely to suffer serious harm if left in transient foster care.

e. Best interest of the child: The same factors that show the existence of parental misconduct or inability also support a finding that termination of parental rights is in the child's best interest.[18] And, when considering the best interest of the child, the juvenile court may also consider the child's need for a stable and permanent home environment.[19]

Here, all the experts agree that termination of the mother's parental rights is in J. F.'s best interest. The child's future "must rest on more than positive promises which are contrary to negative past fact."[20] Although the mother argues she is the victim of J. F.'s father's abuse and her sole problem is her inability to stay away from him, it is well settled that the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation.[21] Here,

---

[13] See *In the Interest of M. C. L.*, 251 Ga. App. 132, 134 (1) (a) (553 SE2d 647) (2001).

[14] See *In the Interest of A. C.*, 272 Ga. App. 165, 167 (1) (c) (611 SE2d 766) (2005).

[15] *In the Interest of A. B.*, 274 Ga. App. 230, 232 (617 SE2d 189) (2005); *In the Interest of B. I. F.*, 264 Ga. App. 777, 780-781 (1) (592 SE2d 441) (2003).

[16] *In the Interest of B. I. F.*, supra.

[17] Id.

[18] See *In the Interest of B. J. F.*, 276 Ga. App. 437, 443 (2) (623 SE2d 547) (2005).

[19] See *In the Interest of B. I. F.*, supra at 781 (2).

[20] (Citation and punctuation omitted.) *In the Interest of K. J.*, 269 Ga. App. 78, 83 (3) (603 SE2d 497) (2004).

[21] See *In the Interest of D. L. S.*, 271 Ga. App. 311, 314 (1) (c) (609 SE2d 666) (2005).

considering the needs of J. F., the detrimental effects of prolonged foster care, and the mother's refusal to accept responsibility for her own problems and to resolve those problems, the record supports the juvenile court's conclusion that termination of the mother's parental rights was in J. F.'s best interest.

*Judgment affirmed. Miller and Ellington, JJ., concur.*

DECIDED FEBRUARY 28, 2007.

*Jeffrey W. Duncan*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Billie J. Crane*, for appellee.